387 A.2d 41

**Lorraine YANCOSKIE, Administratrix, of the Estate of Francis J. Yancoskie and Jason Adam Yancoskie, by his mother and natural guardian, Lorraine Yancoskie and Lorraine Yancoskie in her own right, Appellants,**

v.

**DELAWARE RIVER PORT AUTHORITY.**

Supreme Court of Pennsylvania.

Argued April 22, 1977.

Decided April 28, 1978.

Louis Samuel Fine, Philadelphia, for appellant.

Elizabeth M. McKenna, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POM-
EROY, NIX and MANDERINO, JJ.

## OPINION

POMEROY, Justice.

The central question for decision in this case is whether the Delaware River Port Authority is immune from suit in trespass in the courts of this State. We hold that it is not.

Appellant's husband died as a result of injuries sustained on August 16, 1972, while employed in the construction of the Admiral Barry Bridge from Chester, Pennsylvania, to Bridgeport, New Jersey. A wrongful death and survival action against the appellee Authority and other defendants was brought by the administratrix of Yancoskie's estate and by his widow and child. Under the heading of new matter in its amended answer the Authority claimed that it was "a public corporate agency or instrumentality of

the Commonwealth of Pennsylvania entitled to sovereign immunity" and that it was therefore immune from suit.[1] The Authority's subsequent motion for judgment on the pleadings was granted by the court, and the Superior Court affirmed. 235 Pa.Super. 263, 340 A.2d 533 (1975). The case is here upon our allowance of an appeal.[2] 235 Pa.Super. xli.

■ The courts below, in upholding the Authority's claim of immunity, did not have the benefit of our decision in *Specter v. Commonwealth*, 462 Pa. 474, 341 A.2d 481 (1975). In *Specter*, it was held that an answer to the question of whether the Pennsylvania Turnpike Commission was immune from suit depended upon whether the Commission was "part of the Commonwealth." 462 Pa. at 478, 341 A.2d 481. This issue in turn required "a scrutiny of [the entity's] status in the governmental framework of Pennsylvania" that focused on its "nature . . . and its relationship to other statewide governmental bodies." *Id.* 462 Pa. at 479, 341 A.2d at 483. We believe that an analysis of the legislative acts defining the purposes and powers of the Delaware River Port Authority, together with the relevant judicial decisions, requires a conclusion that, like the Turnpike Com-

1. Appellee contends that its claim of immunity has been admitted by appellant's failure to answer this assertion of immunity in the Authority's amended new matter. This argument is without merit. *Enoch v. Food Fair Stores, Inc.*, 232 Pa.Super. 1, 4 -5, 331 A.2d 912 (1974).

2. Appellate Court Jurisdiction Act of July 31, 1970, P.L. 673, No. 223, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp. 1977 -78).

   A parallel action to the one here involved was brought in federal. district court, but was dismissed by the United States Court of Appeals for the Third Circuit for want of subject matter jurisdiction in the district court. *Yancoskie v. Delaware River Port Authority*, 528 F.2d 722 (3d Cir. 1975), *rev'g* 385 F.Supp. 1170 (D.N.J.1974). See *Louisville & N. R.R. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *Gulley v. First National Bank*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *Phillips Petrol. Co. v. Texaco, Inc.*, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974). See generally Mishkin, *The Federal "Question" in the District Courts*, 53 COLUM.L. REV. 157 (1953). Another parallel action in the New Jersey state courts has been dismissed for want of compliance with the notice requirements of the New Jersey Tort Claims Act, N.J.Stat.Ann. 59:8 · 3. *Yancoskie v. Delaware River Port Auth.*, 155 N.J.Super. 1, 382 A.2d 77 (App.Div.1977).

mission in *Specter*, the Authority is not "an integral part of the Commonwealth," *id.* 462 Pa. at 483, 341 A.2d at 486, and that it is therefore subject to suit, as are "political subdivisions or governmental entities other than the Commonwealth itself." *Id.* 462 Pa. at 478, 341 A.2d at 482. See *Ayala v. Philadelphia Bd. of Educ.*, 453 Pa. 584, 305 A.2d 877 (1973).

In considering the Authority's statutory status some historical background is useful. Pennsylvania's recent involvement in the spanning of the lower Delaware River begins with the Act of July 9, 1919, P.L. 814, *as amended*, 36 P.S. § 3421 *et seq.* (1961). Under this statute, the Commonwealth of Pennsylvania and the City of Philadelphia undertook to provide one half of the cost of construction of what is now known as the Benjamin Franklin Bridge from Philadelphia to Camden. *Id.* § 1, 36 P.S. § 3421. A group known as the Pennsylvania Commission, consisting of four governmental and four non-governmental members,[3] was created to supervise (in conjunction with a similar commission created by the State of New Jersey) the design, construction, and operation of the planned bridge. *Id.* §§ 4 6, 10, 11, 36 P.S. §§ 3424–3426, 3430, 3431.

Although the Pennsylvania Commission was granted extensive powers, including that of eminent domain, *id.* §§ 5, 6, 36 P.S. §§ 3425, 3426, the General Assembly added important limitations. The enabling statute specifically provided:

"the . . . commission shall not proceed to exercise or carry out any authority or power herein or hereby given it to bind the Commonwealth of Pennsylvania beyond the extent to which the Commonwealth of Pennsylvania shall have appropriated or made available to said . . . commission the moneys hereinbefore stipulated as the share of the Commonwealth of Pennsylvania." *Id.* § 4, 36 P.S. § 3424.

3. The Governor, the Auditor General, the State Treasurer, the Mayor of the City of Philadelphia, and four other citizens of the Commonwealth to be appointed by the Governor were to serve on the Pennsylvania Commission. *Id.* § 2, 36 P.S. § 3422.

In addition, the appropriations to the Pennsylvania Commission were not grants but loans. The tolls agreed upon by the Pennsylvania Commission and its counterpart in New Jersey were to be collected at least "until such time as the State of New Jersey, the Commonwealth of Pennsylvania and the City of Philadelphia shall each have been fully reimbursed for all moneys expended to pay the cost of said bridge and the approaches thereto," with interest on such moneys to run at four per cent per annum. *Id.* § 10(a), 36 P.S. § 3430(a). Finally, it was intended that the Pennsylvania Commission was to have a limited life; upon reimbursement in full to the governments that provided the funding, the bridge was to be turned over to local authorities. *Id.* § 11, 36 P.S. § 3431. See also Act of July 13, 1923, P.L. 1093, § 9, 36 P.S. § 3459 (1961).

By 1931, more ambitious plans for interstate cooperation in the economic development of the lower Delaware Valley required extensive statutory change. Accordingly, Pennsylvania and New Jersey created, by means of an interstate compact, a successor to the previously existing interstate body.[4] That successor is now known as the Delaware River Port Authority, the appellee herein.[5] Its purpose was expanded from the operation of a single interstate bridge to embrace the development and improvement of the lower Delaware port district from Philadelphia south to the Delaware border. In addition to its power to operate and maintain the bridges across the Delaware River from Philadelphia south to the Pennsylvania-Delaware border, 36 P.S. § 3503, Arts. I(a), XII–A(1), XII–B(1), the Authority is charged with the development and improvement of port facilities in this area. *Id.* Art. I(c), (k).

4. Act of June 12, 1931, P.L. 575, § 1, *as amended*, 36 P.S. § 3503 (1961 & Supp. 1977–78), and N.J.Stat.Ann., § 32:3–1 *et seq.* (1963), *consented to by, inter alia*, Act of June 14, 1932, c. 258, 47 Stat. 308; Act of June 13, 1964, P.L. 88–320, 78 Stat. 215.

5. Appellee's original name, the Delaware River Joint Commission, was changed to its present form by the Act of July 18, 1951, P.L. 1010, § 1.

The powers granted the Authority by the compact are commensurate with its broad purposes. The Authority is designated as a "public corporate instrumentality of the Commonwealth of Pennsylvania and the State of New Jersey . . . exercising an essential governmental function . . ." *Id.* Art. I. As such, it is granted power: to acquire, hold, use and sell real and personal property (*id.* Art. IV(g)–(h)); "to exercise the right of eminent domain" (*id.* Art. IV(k); see also *id.* Art. XII–B(3) (a)); to enter into contracts (*id.* Art. IV(f)); and to employ "counsel and such other officers, and such agents and employes, as it may require for the performance of its duties . . . and [to] fix and determine their qualifications, duties and compensation" (*id.* Art. IV(e)).

The powers granted to the Pennsylvania Turnpike Commission are similar in nature. See *Specter, supra,* 462 Pa. at 479–80, 341 A.2d 481. The Authority's implied powers, however, are considerably broader than those of the Commission. Unlike the Turnpike Commission, the Authority is permitted

". . . generally to exercise, in connection with its property and affairs and in connection with property within its control, any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs." 36 P.S. § 3503, Art. IV(n).

The Authority differs from the Turnpike Commission in another important respect. Although it is contemplated that when all the Commission's financial obligations are paid or provided for the Commission will be dissolved and its assets vested in the Commonwealth's Department of Transportation, which will then operate the Turnpike system,[6] the Authority is granted "perpetual succession." 36 P.S. § 3503, Art. IV(a).

In one critical particular, however, the Commission and the Authority possess precisely the same status, *viz.,* both are financially independent of the Commonwealth of Penn-

6. Act of May 21, 1937, P.L. 774, No. 221, § 15, 36 P.S. § 6520 (1961).

sylvania. The Authority, like the Commission, raises revenue by means of bonds and satisfies these obligations by toll and other user charges.[7] Moreover, and again like the Commission, the Authority's debts are not Commonwealth obligations. Article VII of the compact provides in full:

"Notwithstanding any provision of this agreement, the commission shall have no power to pledge the credit of the Commonwealth of Pennsylvania, or the credit of the State of New Jersey, or the credit of any county, city, borough, village, township or other municipality of said Commonwealth or said State, or to create any debt of said Commonwealth or of said State or of such municipality."[8]

The interstate compact in question does not give an explicit answer to the question whether the Authority is an "integral part of the Commonwealth," *Specter, supra,* 462 Pa. at 483, 341 A.2d 481, but the structure of the authority strongly indicates that it is not. The Authority is declared to be a "public corporate instrumentality," and it is vested with the powers usually granted to a corporation operated for profit, *e.g.,* perpetual succession. Although the Authority does possess the governmental power of eminent domain, it lacks an essential attribute of a true governmental body, the taxing power. 36 P.S. § 3503, Art. IV(n). Moreover, there is no close connection, such as that between the Pennsylvania Department of Transportation and the Turnpike Commission, between the Authority and Commonwealth agencies, and the financially separate status of the Authority is expressly provided. In sum, as this Court

7. *Id.* Art. IV(j); Art. VIII. Start-up appropriations provided by the Commonwealth and the City of Philadelphia to appellee's predecessor for the construction of the Benjamin Franklin Bridge were to be repaid in full from the sale of bonds and other obligations by June 30, 1932 "or as soon as practicable thereafter." *Id.* Art. VI(a), (c). See also Act of July 9, 1919, P.L. 814, § 10(a), *as amended,* 36 P.S. § 3430 (1961), discussed *supra.*

8. See also Act of June 19, 1968, P.L. 226, No. 108, § 6, 36 P.S. § 3510.6 (Supp. 1977–78). For a similar provision affecting the Turnpike Commission, see the Act of May 21, 1937, P.L. 774, No. 221, §§ 2, 6, *as amended,* 36 P.S. §§ 652b, 652f (1961 & Supp. 1977–78).

observed some forty years ago, the compact agreed upon by Pennsylvania and New Jersey in 1931 had the effect of "relinquishing the control theretofore exercised severally by the two states [over the predecessor commissions' property] and in turning the property over to [a] two-state corporation . . ." *Commonwealth ex rel. Smith v. Clark*, 331 Pa. 405, 414–15, 200 A. 41, 46 (1938) (dictum).[9]

Remaining for consideration are the judicial decisions in which the status of the Authority has been in issue.

In the *Delaware River Joint Comm'n Case*, 342 Pa. 119, 19 A.2d 278 (1941), this Court stated that the Authority's predecessor in name "acts as the agent of the Commonwealth," *id.* 342 Pa. at 122, 19 A.2d at 279, and that it was therefore not required to reimburse a telephone company for the cost of relocating certain lines. The Court had no occasion, however, to discuss the precise nature of the agency, and it was sufficient to observe that the grant of a franchise to the public utility in that case "was expressly subjected to municipal regulation . . . ." *Id.*

A comprehensive discussion of the Authority's status came one year later in *Souder v. Philadelphia Police Pension*

---

**9.** Appellee argues that certain provisions of the compact require a conclusion that the Authority is an integral part of the Commonwealth. This is said to be the case because six of the eight Pennsylvania members of the Authority are appointed by the Governor (with the Auditor General and the State Treasurer filling the two remaining seats); because the Authority is required to submit annual reports to the legislatures of both states; and because new projects (with certain exceptions) must be approved by the legislatures of both states, and in some cases by the governors thereof.

We find these contentions unpersuasive. It should be noted that the members of the Turnpike Commission are also appointed by the Governor and, unlike his appointees to the Authority, must be confirmed by the Senate. Act of May 21, 1937, P.L. 774, No. 211, § 4, *as amended*, 36 P.S. § 652d (Supp. 1977–78). In addition, there is nothing in the requirement that a public corporation submit reports to the legislatures of the compacting states that serves to make that corporation an integral part of either state, or of both. Finally, the requirement that legislative authorization be given for new projects (36 P.S. § 3503, Arts. XII, XII-A, XII B), is not dissimilar to the statutory authorizations for the various extensions of the Pennsylvania Turnpike System. See *Specter, supra*, 462 Pa., at 482 n.6, 341 A.2d 481.

*Fund*, 344 Pa. 286, 25 A.2d 191 (1942). In that case, payments from a pension fund were discontinued after plaintiff's decedent had gone to work for the Authority's predecessor in name; the Fund relied on a provision of its by-laws authorizing suspension of payment if a beneficiary should "enter the service of the State of Pennsylvania." This Court held that employment with the Authority did not constitute entering "the service of the State" and thus did not permit the suspension of benefits. In an opinion by Mr. Justice (later Chief Justice) Drew, we said:

> "By directing the Governor to enter into this compact the legislature clearly indicated its intention to abandon the previous dependent administrative agency known as the 'Pennsylvania commission', and to establish in its stead the 'Delaware River Joint Commission' [i.e., the Authority] as a special public corporation. Upon the execution of the agreement on July 1, 1931, the Commission became a distinct entity, separate and apart from either State. . .

> "Its obligations were payable solely from its own revenues raised by it through the sale of its bonds and the collection of tolls. Its employees were not those of this Commonwealth or of the State of New Jersey, but of this public corporation, which hired them and paid their salaries.

> "While the Delaware River Joint Commission acts as the agent of the Commonwealth (*Delaware River Joint Commission Case*, 342 Pa. 119, 122, 19 A.2d 278), yet it is indeed similar in structure to the various Municipal Authorities authorized by statute to be created throughout the State. They are public corporations, being corporate agencies engaged in the administration of civil government." *Id.* 344 Pa. at 291-92, 25 A.2d at 194. (citations omitted).

The Authority's status as a "special public corporation" remained intact for some twenty years. But in *Anderson Appeal*, 408 Pa. 179, 182 A.2d 514 (1962), the Court rejected what had been settled law in a decision that may fairly be

characterized as the high-water mark of immunity for governmental and quasi-governmental bodies in Pennsylvania. Holding that the Authority "was intended to be and has always been an agency of the Commonwealth of Pennsylvania carrying out an executive function," *id.* 408 Pa. at 182, 182 A.2d at 515, the Court rejected a claim that the Authority was liable for consequential damages due to the activities of the Authority in construction of the Walt Whitman Bridge across the Delaware.[10] In disavowing the analysis used in *Souder,* the Court relied on cases such as *Delaware River Joint Comm'n Case, supra.* For the reasons noted above, however, that case in no way required a finding of immunity. Also cited by the *Anderson* court was *Delaware River Joint Toll Bridge Comm'n v. Carver,* 399 Pa. 545, 160 A.2d 425 (1960). But that case, which held that a commissioner of an entity quite similar in structure to the appellee Authority was a public officer, accepted the conclusion of a prior case that that commission "is a separate corporate entity and not the alter ego of the Commonwealth. While it is the 'instrumentality' and 'agent' of the Commonwealth, it is not the Commonwealth." *Carver v. Delaware River Joint Toll Bridge Comm'n,* 70 Dauph. 114, 116 (1957). Further reliance was placed in *Anderson* on a series of cases involving the Pennsylvania Turnpike Commission, culminating in *Rader v. Pennsylvania Turnpike Comm'n,* 407 Pa. 609, 182 A.2d 199 (1962). For the reasons noted in *Specter, supra,* 462 Pa. at 485 93, 341 A.2d 481, however, such cases are no longer controlling on the question of immunity.

We are of the opinion that *Anderson,* like *Rader* before it, can no longer be regarded as authoritative on the question

10. At the time *Anderson* was decided, "municipal and other corporations" were liable to owners of property that was taken or "injured." Pa.Const. of 1874, art. XVI, § 8. See also Pa.Const. art. X, § 4. The Commonwealth, however, was not liable for any injury to property in the absence of an actual taking. *E.g., McGarrity v. Commonwealth,* 311 Pa. 436, 439, 166 A. 895 (1933), *appeal dismissed,* 292 U.S. 19, 54 S.Ct. 565, 78 L.Ed. 1095 (1934). Liability for certain consequential damages is now imposed on the Commonwealth by the Eminent Domain Code, Act of June 22, 1964, Spec. Sess., P.L. 84, art. VI, § 612, 26 P.S. § 1 612 (Supp. 1977-78).

of immunity; the bases for the conclusion in *Anderson* were either unconvincing at the time or have since been rejected. In light of the structure of the Authority under the interstate compact, and the better reasoned decisions, we conclude that the Authority, as a public corporation that cannot be said to be an "integral part of the Commonwealth," cannot claim immunity from suit in trespass.[11]

The order of the Superior Court is vacated and the cause remanded to the court of common pleas with a *procedendo.*

ROBERTS, NIX and MANDERINO, JJ., concur in the result.

EAGEN, C. J., and O'BRIEN, J., dissent.

11. As in *Specter, supra*, 462 Pa. at 493 n.18, 341 A.2d 481, there is no need for us to consider whether the interstate compact's provision that the Authority may "sue and be sued," 36 P.S. § 3503, Art. IV(b), operates as a waiver of immunity as a matter of Pennsylvania law.