EASTERN PARALYZED VETERANS ASSOCIATION, INC., PLAIN-
TIFF–RESPONDENT, v. CITY OF CAMDEN AND MELVIN R.
PRIMAS, AS MAYOR OF THE CITY OF CAMDEN, DEFEND-
ANTS–RESPONDENTS, AND DELAWARE RIVER PORT AU-
THORITY AND PORT AUTHORITY TRANSIT CORPORATION,
DEFENDANTS–APPELLANTS.

CITY OF CAMDEN, DEFENDANT AND THIRD–PARTY PLAIN-
TIFF–RESPONDENT, v. JOHN P. RENNA, COMMISSIONER OF
THE DEPARTMENT OF COMMUNITY AFFAIRS, STATE OF
NEW JERSEY, THIRD–PARTY DEFENDANT-RESPONDENT.

Argued January 19, 1988—Decided August 9, 1988.

*Hersh Kozlov* argued the cause for appellants (*Kozlov, Seaton & Romanini*, attorneys; *Gilbert L. Brooks*, on the briefs).

*James D. Fornari*, a member of the New York bar, argued the cause for respondent Eastern Paralyzed Veterans Association, Inc. (*Hannoch Weisman*, attorneys; *James D. Fornari* and *Theodore Margolis*, of counsel).

*John J. Chernoski,* Deputy Attorney General, argued the cause for respondent *John P. Renna,* etc. (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Deputy Attorney General, of counsel).

*Dennis G. Kille,* First Assistant City Attorney, argued the cause for respondents City of Camden, et al. (*Patricia A. Darden,* City Attorney, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This case presents a troublesome dilemma for resolution. It involves a cooperative undertaking by a bi-state agency and a New Jersey municipal agency to create in New Jersey a downtown mass transportation center. Such a center will serve the laudable public goals of reducing dependence on automobiles, improving public transportation, and strengthening an inner city area. Both the Camden Housing Authority and the Delaware River Port Authority (DRPA), a bi-state agency of New Jersey and Pennsylvania, had the best of intentions. Under their cooperative plan, the Camden Housing Authority was to erect and construct a mass transit terminal in which DRPA's subsidiary Port Authority Transportation Corporation (PATCO) train service would operate.

The issue in this appeal has been presented as whether New Jersey's barrier-free design requirements in aid of the handicapped may be applied to the DRPA's operations or facilities. The trial court, differentiating between independent state regulation of the "external" operations of bi-state agencies and states' common regulations of their "internal" operations, concluded that the DRPA was required by New Jersey's Handicapped–Access Law to grant the municipality permission to install an elevator in the facility. *Eastern Paralyzed Veterans Ass'n, Inc. v. Camden,* 220 *N.J.Super.* 573, 582–85 (Ch.Div. 1986). The Appellate Division affirmed that judgment, but did so primarily on the ground that the portion of the building in

which the elevator is located is "not exempt from the operation and effect of the applicable New Jersey statutes and regulations by virtue of the contractual arrangements and property conveyances made among and between the Delaware River Port Authority, Camden and the Housing Authority of Camden." *Eastern Paralyzed Veterans Ass'n, Inc. v. Camden,* 220 *N.J.Super.* 528, 531 (1987).

We hold that the trial court's theory of jurisdiction cannot be sustained, and we believe that before a court can conclude that the agency impliedly consented to New Jersey's design requirements, it must consider the question of whether the structural change would significantly affect PATCO's operations. On remand to consider that question, the Chancery Division may also consider whether the requirement may be justified as one of "complementary" regulation in each of the enabling states.

I

The controversy concerns the provision of an elevator for handicapped access to PATCO's underground train system. The DRPA, through this subsidiary, is authorized to conduct a mass-transit rail service between downtown Philadelphia and various stops in Camden County.

For many years, the line had an underground stop, Broadway Station, in downtown Camden. It suited the purposes of both PATCO and Camden to incorporate that stop into a new multi-purpose transportation center; Camden is in the midst of a major urban revitalization effort. (For ease of convenience we shall refer only to Camden, although the City chose the Camden Housing Authority as the agency to undertake the project.)

PATCO's Broadway station was valuably situated in the heart of the renewal areas. The parties agreed in 1984 that Camden would acquire the air rights over the Broadway stop in contemplation of construction of the new downtown transportation terminal to serve rail and bus passengers (Camden Transportation Center or CTC). It is hard to grasp from an appellate

record all of the details of the structural interplay, and we do not attempt an exact recital here. In simplest terms, Camden was to build the transportation center "above and around" a central core of property rights retained by DRPA: the underground corridor tunnel within which the DRPA would operate its train line and a concourse area over the tunnel for its ticket operations. Camden obtained various federal urban development grants for the $20 million project, which was scheduled to open in March 1987. The design question was: how were people to pass from the street-level concourse down to PATCO's trains?

With minor exceptions, defendants accept the version of the facts submitted by plaintiff, Eastern Paralyzed Veterans Association (EPVA): the DRPA and PATCO were to use a modern twenty-million dollar transportation center paid for principally by federal funds received by the City of Camden, not by the DRPA. Since this center would incorporate PATCO's Broadway Station and New Jersey Transit's bus lines, as well as a large parking garage for private cars, ridership on the PATCO Rapid Transit System would be likely to increase.

The City does not dispute the DRPA's right to approve construction plans for the CTC, as the transportation center is to be built over and provide direct access to the DRPA's subway tunnel. According to EPVA, the DRPA deeded to the City its old Broadway station buildings and all rights above a plane six feet below their ground level, thereby including the rights to a plane six feet below the floor level of the Camden Transportation Center.[1] The DRPA retains property rights

---

[1]Before us, this allocation of rights appears to be disputed. In its supplemental letter brief on the question of complementary legislation, the DRPA insisted that

under the terms of the Redevelopment and Construction Agreement, the DRPA conveyed to the Camden Housing Authority air rights above a lower [plane] of 43 feet above the top of the rail of the PATCO High Speedline. The DRPA retained fee simple absolute title to the land below the subway

that give it use of certain space in the Camden Transportation Center, including offices, maintenance areas, police quarters, and a passenger processing area. The DRPA also contributed $274,000 toward the construction of the CTC—a small portion of its more than twenty million dollar cost.

The agreements between the DRPA and the City recite that the CTC will be a facility of the City of Camden, not of the DRPA; nor will the DRPA have responsibility for the CTC's finances, construction, or maintenance. The CTC is being built by, and will be owned by, the City of Camden; it will be operated and maintained by the City and by the New Jersey Transit Authority.

The City is building two staircases and one escalator to connect the ground floor of the CTC, where buses and cars will deposit passengers, to the train platform of the PATCO Broadway Station. PATCO and the DRPA have given the City permission to pierce their transportation corridor and to make whatever structural changes are necessary to enable the staircases and the escalator to be installed.

Camden sought approval of its construction plans from the New Jersey Department of Community Affairs (DCA), the agency of state government having jurisdiction to review development plans of this type for compliance with State codes. In its review, the State requested that in order to satisfy State regulations regarding accommodations to serve the handicapped, the building plans be altered to provide an elevator from the street level terminal concourse to the subway platform. PATCO objected to this requirement, but after consultation with the City sought to negotiate a solution with DCA under which the City and PATCO would make provision for the future installation of such an elevator. They proposed that

tunnel itself, to the platform into the tunnel, to the roof of the tunnel, and up to 43 feet above the top of the rail or 22.64 feet above ground level. Hence, our description of the property interests in the station area may have to be adjusted to the actual arrangements.

CTC construct framing with structural steel, leaving an opening at the main floor of the terminal for a future elevator shaft, and leaving provision at the train level for the elevator machinery. Negotiations concerning the exact location of the proposed elevator shaft continued through the summer of 1985.

In August 1985, EPVA sued the City and the DRPA to require the installation of an elevator. The EPVA alleges that under *N.J.S.A.* 52:27D–129b the construction by the DRPA of any structure or building in the State of New Jersey is subject to the requirements of the State Uniform Construction Code Act (the Code), *N.J.S.A.* 52:27D–119 to –141. The Code requires that building plans be reviewed and approved prior to the issuance of a building permit. *N.J.S.A.* 52:27D–130, 131. As a part of the review of a permit application, which includes review of the building plans, the governmental enforcing agency must ensure that, among other things, the requirements of the Code have been met. *N.J.S.A.* 52:27D–131 a.

If the local enforcing agency does not have the appropriate capacity to review a particular class of structure, as in the case of the CTC, the Department of Community Affairs (DCA) acts as the enforcing agency for plan-review purposes. *N.J.A.C.* 5:23–3.11(a)(4). Under *N.J.S.A.* 52:32–5, the DCA itself promulgates regulations prescribing facilities for the physically handicapped. The CTC, a public transportation terminal or station, is a "public building" for purposes of the Handicapped Access Law, *N.J.S.A.* 52:32–6(a); thus, its construction plans are required to provide for facilities for the physically handicapped. *N.J.S.A.* 52:32–4. The DCA Commissioner, who is required by *N.J.S.A.* 52:32–5 to promulgate guidelines for such facilities, adopted the Department of Treasury's Barrier–Free Design Regulations, *N.J.A.C.* 17:19A–1. The Commissioner has since revised these regulations. *See D.I.A.L. v. Clifton Construction Bd. of Appeals,* 218 *N.J.Super.* 74, 77 n. 1 (1987).

Plaintiff also alleged that the Camden Transportation Center is a "place of public accommodation" within the meaning of the

New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42, which defines that term to include "any public conveyance operated on land or water, or in the air, [and] any stations and terminals thereof." *N.J.S.A.* 10:5–5(*l*). Under LAD no person may be denied access to a place of public accommodation "because such person is or has been at any time handicapped." *N.J.S.A.* 10:5–4.1.

The City of Camden claimed that it wanted to install the elevator but that the DRPA and PATCO had prevented it from doing so. The City filed a third-party complaint against the DCA seeking issuance of the necessary building permits and asked that the DCA be bound by the trial court's determination in the case. The DRPA and PATCO moved for summary judgment on the basis that the Barrier–Free Design Regulations and the requirement for construction embraced by the LAD could not be applied to them. Plaintiff, EVPA, filed a cross-motion for summary judgment, seeking the installation of the elevator based on the State Uniform Construction Code and the Barrier–Free Design Regulations.

The trial court concluded that the Uniform Construction Code mandated the installation of the elevator. 220 *N.J.Super.* at 588. With regard to the applicability of the Uniform Construction Code, the court concluded that a distinction could be made between "internal" and "external" regulation of the conduct of bi-state agencies. The Chancery Division thus held that

> [c]ompliance with the [Code] and the Law Against Discrimination is a valid exercise of the sovereign power of the State of New Jersey to preserve the safety and general welfare of the public. Compliance with those enactments does not, in anywise, affect the inner workings of the interstate agency. They provide for access to the CTC by the general public. The general public is not a homogen[e]ous unit; it includes the handicapped. It consists of individuals who are sure footed, as well as those who are lame, sight or hearing impaired, and those confined to a wheelchair. The DRPA is, therefore, required to provide the general public with access to the CTC in compliance with the [Code] and the Law Against Discrimination. [220 *N.J.Super.* at 584–85 (footnote omitted).]

The court ordered the City of Camden to amend the CTC's construction plans to include an elevator for the use of the general public between the main floor of the CTC and the train

platform of the PATCO rail line system. 220 *N.J.Super.* at 588. The court also ordered DRPA and PATCO to provide all necessary approvals, permits, easements, and assistance to the City to enable it to comply with this judgment.

On appeal, the Appellate Division affirmed. 220 *N.J.Super.* 528 (1987). Although it did not apply the trial court's distinction between regulation of "internal" and "external" operations, the Appellate Division agreed that the DRPA had, by its contract, impliedly consented to the application of the New Jersey Uniform Construction Code. 220 *N.J.Super.* at 531. We granted certification. 108 *N.J.* 221 (1987).

## II

■ The Delaware River Port Authority was created with the approval of Congress by an interstate compact between the State of New Jersey and the Commonwealth of Pennsylvania. *N.J.S.A.* 32:3–2. The primary purpose of the DRPA is the development and maintenance of bridges and port facilities between the two states. In addition, the Authority is authorized to provide a rail transportation service (PATCO service) between the City of Philadelphia and various communities within the port district in New Jersey. *N.J.S.A.* 32:3–2(b). Such an interstate compact is a "law of the Union," *Delaware River Joint Toll Bridge Comm'n v. Colburn,* 310 *U.S.* 419, 427, 60 *S.Ct.* 1039, 1040, 84 *L.Ed.* 1287, 1289 (1940), whose interpretation is a question of federal law. *Cuyler v. Adams,* 449 *U.S.* 433, 438 n. 7, 101 *S.Ct.* 703, 707 n. 7, 66 *L.Ed.*2d 641, 648 n. 7 (1981). We are not concerned here, however, with the complex question of whether such federal compacts in themselves create federal causes of action. *See Port Auth. Bondholders Protective Comm. v. Port of New York Auth.,* 387 *F.*2d 259 (2nd Cir.1967) (federal question raised in relation to original Port Authority Compact by concurrent statutes of New York and New Jersey providing for construction of World Trade Center); *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 507 *F.*2d 517 (9th Cir.1974), *cert. denied sub nom.*

*Raley v. League to Save Lake Tahoe,* 420 *U.S.* 974, 95 *S.Ct.*
1398, 43 *L.Ed.*2d 654 (1975) (federal right of action implied).

■ The DRPA, then, is not the agency of a single state, but
rather a public corporate instrumentality of both New Jersey
and Pennsylvania. *Yancoskie v. Delaware River Port Auth.,*
155 *N.J.Super.* 1, 4 (1977), *aff'd,* 78 *N.J.* 321 (1978); *see also
Yancoskie v. Delaware River Port Auth.,* 478 *Pa.* 396, 387
*A.*2d 41 (Pa.1978) (Pennsylvania's immunity does not extend to
this agency). "It follows that neither creator state can unilat-
erally impose additional duties, powers or responsibilities upon
the Authority." *Nardi v. Delaware River Port Auth.,* 88 *Pa.
Commw.* 558, 560, 490 *A.*2d 949, 950 (1985) (citing *C.T. Hell-
muth & Assocs., Inc. v. Washington Metropolitan Area Tran-
sit Auth.,* 414 *F.Supp.* 408 (D.Md.1976), and *Bell v. Bell,* 83
*N.J.* 417 (1980)).

In *Bell, supra,* Justice Sullivan explained that New Jersey
could not unilaterally exercise jurisdiction over the DRPA, a
bi-state agency, because to do so would violate a compact that
made no provision for such jurisdiction. The Court wrote:

> Bi-state agencies exist by virtue of compacts between the states involved,
> entered into by their respective legislatures with the approval of Congress.
> When formed, they become a single agency of government of both states.
> Their primary purpose is to cooperate in advancing the mutual interests of the
> citizens of both states by joint action to overcome common problems. We fail
> to see how either state could enact laws involving and regulating the bi-state
> agency unless both states agree thereto. To sanction such practice would lead
> to discord and a destruction of the purposes for which such bi-state agencies
> are formed. [83 *N.J.* at 424 (quoting *Delaware River Bay Auth. v. New Jersey
> Pub. Employment Relations Comm'n,* 112 *N.J.Super.* 160, 165–66 (App.Div.
> 1970), *aff'd o.b.,* 58 *N.J.* 388 (1971)).]

■ The same rationale applies here: to hold that the DRPA
is subject to the New Jersey Uniform Construction Code would
result in the imposition, unauthorized by the bi-state compact,
of substantial duties or responsibilities on that Authority. Both
New Jersey and Pennsylvania have consistently required com-
plementary state legislation for single-state jurisdiction to be
exercised over the Authority. *See Nardi v. Delaware River
Port Auth., supra,* 88 *Pa. Commw.* 558, 490 *A.*2d 949; *Yanco-*

*skie v. Delaware River Port Auth., supra,* 478 *Pa.* 396, 387 *A.*2d 41.

As noted, in considering whether New Jersey law applied to the DRPA's providing an elevator for the CTC, the trial court based its conclusion on the so-called internal-external distinction made in *Agesen v. Catherwood,* 26 *N.Y.*2d 521, 311 *N.Y.S.*2d 886, 260 *N.E.*2d 525 (1970):

> The distinction between the internal operations and conduct affecting external relations of the Authority is crucial in charting the areas permitting unilateral and requiring bilateral State action. New York and New Jersey have each undoubted power to regulate the external conduct of the Authority, and it may hardly be gainsaid that the Authority, albeit bistate, is subject to New York's laws involving health and safety, insofar as its activities may externally affect the public * * *. [*Eastern Paralyzed Veterans Ass'n v. Camden, supra,* 220 *N.J.Super.* at 582 (quoting *Agesen v. Catherwood, supra,* 26 *N.Y.*2d at 525, 311 *N.Y.S.*2d at 888, 260 *N.E.*2d at 526–27.]

*But see Malverty v. Waterfront Commission of New York Harbor,* 71 *N.Y.*2d 977, 529 *N.Y.S.*2d 67, 524 *N.E.*2d 421 (1988) (similar public policy of two states does not suffice to render one state's legislation applicable to bi-state Commission's employment practices. No reference to internal-external distinction). We find no precedent in New Jersey in support of this distinction. *See DeRose v. Byrne,* 135 *N.J.Super.* 273, 284 (Ch.Div.1975), *judgment vacated due to mootness of controversy,* 139 *N.J.Super.* 132 (App.Div.1976) (internal structure of New Jersey Conflict of Interest Law precludes consideration of internal-external distinction in context of membership in bi-state waterfront commission). Only when the compact itself recognizes the jurisdiction of the compact states may it be subject to single-state jurisdiction. For example, in *People v. City of South Lake Tahoe,* 466 *F.Supp.* 527, 537 (E.D.Cal.1978), California was held to have the right to impose environmental quality regulations on the regional authority only because that agency's own charter provided that the ordinance, rules, and regulations adopted by the bi-state agency merely " 'establish[ed] a minimum standard applicable throughout the basin, and any political subdivision may adopt and enforce an equal or higher standard applicable to the same subject of regulation in

its territory.' " 466 *F.Supp.* at 537 (citation omitted). Similarly, the DRPA's charter provides, for example, that land acquisition in each state be governed by that state's law of eminent domain. However, the DRPA's compact does not contemplate single-state jurisdiction in general. Hence, we conclude that the trial court erred in ruling that the DCA could unilaterally impose on the DRPA the obligations set forth in the New Jersey Uniform Construction Code and the New Jersey Law Against Discrimination.

## III

Notwithstanding that the internal-external distinction will not yield a ready resolution of these issues, the theories of complementary regulation and implied consent, given a fuller exposition, may yield a just resolution of the dispute. Despite the apparent simplicity of the question, there are nagging complexities involved in determining whether there shall be an elevator to the PATCO trains. We shall address each of the theories separately.

## A.

The corollary of the proposition that neither state may individually impose its will on the bi-state agency is that the agency may be made subject to complementary or parallel state legislation. *Cf. Delaware River Joint Toll Bridge Comm'n v. Colburn, supra,* 310 *U.S.* 419, 60 *S.Ct.* 1039, 84 *L.Ed.* 1287 (where compact prescribed procedures for land acquisition in each state, no unilateral departure could be made by agency). The DRPA does not dispute this principle; indeed, it distinguishes from the present case the example that Pennsylvania DRPA employees must observe stop-lights in New Jersey, by replying that Pennsylvania and New Jersey have similar legislation in this regard. *See Nardi v. Delaware River Port Auth., supra,* 88 *Pa. Commw.* at 564 n. 10, 490 *A.*2d at 952 n. 10 (if disability pay enactments of New Jersey and Pennsylvania were substantially similar, court could find agreement by the states concern-

ing extent of disability pay). The trial court's approach to the present case did not consider whether the New Jersey regulation could be sustained on the basis that there were substantially similar legislative acts in both New Jersey and Pennsylvania. The DRPA has not had occasion to attempt to construct a major facility in Pennsylvania, and the record is silent on whether in such a case DRPA would have to provide handicapped access under Pennsylvania law.

We invited supplemental briefs from the parties with respect to this issue, but find that the parties are in substantial disagreement on this point. The EPVA argues that "[i]f construction of the CTC were deemed a 'renovation' of the PATCO station, it would be required to be accessible [to the handicapped] under 49 C.F.R. § 27, 67(b)"; that provision, part of the Department of Transportation's 1979 regulations governing handicap accessibility to programs receiving federal funds, mandates accessibility of such renovated facilities "to the maximum extent feasible." Hence, since the burdens, although of federal origin, would be the same in either state, there is no point in objecting to the elevator. However, the DRPA insists that the CTC, as a replacement for the Broadway PATCO station, is not a "renovation." The DRPA contends that unlike New Jersey's Uniform Construction Code and Barrier–Free Design Code, Pennsylvania's statutes governing handicap accessibility would not *require* elevators in a Pennsylvania counterpart of the CTC; however, if elevators were provided, they would have to be made accessible to and operable by the physically handicapped.

 DCA argued before us that this feature of the matter was irrelevant. In DCA's view, the DRPA is independently subject to the requirements of the Uniform Construction Code whenever the DRPA undertakes a construction activity in New Jersey: the Code states that it applies to all bistate agencies. *N.J.S.A.* 52:27D–129 b. However, when Pennsylvania and New Jersey intended that local law would govern an area relevant to

their compact, such as acquisitions by eminent domain, *N.J.S.A.* 32:3–13.51, or consent for highway connections to the bi-state toll bridge, *N.J.S.A.* 32:3–13.55, they so specified. Thus " '[w]e fail to see how either state could enact laws involving and regulating the bi-state agency unless both states agree thereto.' " *Bell, supra,* 83 *N.J.* at 424 (citation omitted). Some showing of agreement by both states to the enforcement of the Uniform Construction Code at DRPA's New Jersey facilities will be required to sustain this theory.

We have no hesitancy to decide the question of law but believe that it is fact-sensitive. In fairness to the parties, we should give them an opportunity to present any relevant data concerning the specifics of the construction. Suffice it to observe that there are sufficient disputed facts that we should hesitate to decide an important question of law without a developed record. *See Democratic Party of New Jersey, Inc. v. Collins,* 109 *N.J.* 521 (1987).

### B.

If the New Jersey regulatory system is not "complementary" to Pennsylvania's, then we believe that additional findings must be made before we can conclude that the DRPA has impliedly consented to provide elevator access to its train platform. As noted, the Appellate Division concluded that the DRPA had implicitly consented to the plenary exercise of jurisdiction by New Jersey. This would be a critical finding indeed, because as an independent agency possessing the power to sue and be sued, *Bell v. Bell, supra,* 83 *N.J.* 417, the DRPA could waive its rights under the compact and cede jurisdiction to the New Jersey regulatory agencies. We surmise that in almost all circumstances such as these, an agency would have its construction plans reviewed by the state in which the construction was planned. We were informed at oral argument that the Port Authority of New York and New Jersey has voluntarily cooperated with New Jersey agencies to provide handicapped

access to planned new facilities. We do not, however, find that the DRPA offered such cooperation here: it is quite clear from the record that from the outset the DRPA resisted the exercise of jurisdiction by the State of New Jersey and limited its own efforts to providing the shaft for future installation of the elevator.

The DRPA insists that the agreement between the parties incorporated only those specific plans and specifications that the agreement referred to; the DRPA claims the explicit right under the agreement to refuse access at particular locations. It argues that

[t]he rapid transit system passenger processing area * * * will be located completely within the area to which the DRPA retained fee simple absolute title. Once the City has replaced the rapid transit system passenger processing area, the area will not only remain owned by the DRPA, but DRPA will be completely responsible for the care, maintenance and operation of the rapid transit system passenger processing area.

The elevator itself would operate only between the groundfloor of the PATCO rapid transit system passenger processing area and the platform in [its] subway tunnel * * *.

We note that the parties disagree about who "owns" the space where the elevator shaft will be. We observe, however, that the technical basis of the argument is devoid of any showing of burden imposed by the *design* feature itself. The elevator was to have been built at no cost to the DRPA and was presumably to have been maintained by the operator of the transit facility.

■ We are satisfied, as was the Appellate Division, that the arrangements between the DRPA and Camden carried with them the necessary understanding that Camden would have to get building permits for the structure, and the only agency that could issue them was DCA. The easements or rights conveyed to Camden by the DRPA must have signified that Camden would be putting up a building that it could open for use. DRPA had to understand that the details of the construction would be subject to such local review. We note, without

resolving its meaning, a specific provision in the agreement between the City and DRPA that

> [a]ny changes in the said portion of the CTC; or any changes in the plans which may impact on the structural and/or operational integrity of the RTS [Rapid Transit System], as it now exists or as it is planned to exist under the approved plans, referred to in Section 2.2 above; or any changes in the plans which may in any way affect those areas the use of which shall be provided DRPA or its subsidiary PATCO, or the ingress and egress thereto; shall require the prior written approval of the CEO of DRPA.

But even though consent to some changes was implicit in the understanding of the parties, we are equally satisfied that the DRPA should not be seen to have tacitly consented to anything that would have a significant impact on their transit operations. Thus, if deeper footings or different sheathing would affect their roadbed or tracks, they should not be bound by the suggested change.

On this score, then, we are led ultimately to consider the real policy question in this case. That question is not whether there shall be an elevator in a building, but whether and on what terms the handicapped shall have access to public transportation. For underlying the dry technicalities of jurisdiction is the more fundamental question of governmental transit policy. It is not the burden of an elevator on its property that troubles the DRPA, but the burden of an elevator on its rail operations. In this context, the DRPA asks that we take cognizance of the special nature of its rapid transit facilities. The PATCO high-speed line operates fourteen unmanned stations between downtown Philadelphia and suburban Lindenwold in southern New Jersey. Fare collection is self-service: bill changers, magnetic ticket vendors, and ticket-reading fare gates are located in the lobby or mezzanine of each station. PATCO's is a highly automated and, shall we say, impersonal operation. Just one PATCO employee is required on each train. That operator, sitting in front of the lead car, serves only to operate the access doors, to start and stop the trains, and to make announcements over a public-address system.

DRPA argues that no other stop on its line is equipped to provide service to the handicapped. It urges that the imposition of this requirement at the Broadway station would in turn necessitate the addition of personnel or the alteration of facilities at other PATCO stations to assure the safety of the mobility-impaired patrons admitted at Broadway. Otherwise, the DRPA argues, it will have provided "an elevator to nowhere."

It is a bitter irony that the consequence of that argument is that DRPA may never install the first elevator, with the result that the handicapped may never have access to the PATCO system. If DRPA were so inclined, the installation of an elevator in the Camden station could be the first step towards the gradual adaptation of PATCO facilities to accommodate the handicapped. If PATCO seeks to justify its decision on cost considerations, the trial court on remand might want to analyze the cost to all users of the installation of the elevator over the life of the facility. In making any such analysis, we commend to the trial court its finding to the effect that the handicapped are part of, not apart from, the public. 220 *N.J.Super.* at 584–85. From that perspective one wonders why DRPA should segregate the handicapped from the rest of society. If a facility were being built by anyone else in New Jersey, the handicapped could not be excluded. Based on the record before us, we are uncertain whether Pennsylvania would require the same result.

Government must make complex policy choices in deciding the extent to which it shall plan or retrofit mass transportation facilities to meet the needs of the handicapped. "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexander v. Choate,* 469 *U.S.* 287, 295, 105 *S.Ct.* 712, 717, 83 *L.Ed.*2d 661, 668 (1985) (footnote omitted). Thus, Section 504 of the Rehabilitation Act of 1973, 29 *U.S.C.* § 794, prohibits discrimination against the handicapped in any program or activity

receiving federal financial assistance. In addition, Section 16 of the Urban Mass Transportation Assistance Act of 1970, 49 U.S.C. § 1612, declared the national policy that "elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services." 49 U.S.C. § 1612(a). All federal programs offering assistance to mass transportation are to contain provisions implementing this policy.

A declaration of policy does not, however, resolve the concrete application of principle to policy when federal law is applicable. See Disabled in Action of Pennsylvania v. Sykes, 833 F.2d 1113 (3rd Cir.1987), cert. denied, —— U.S. ——, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988) (city and transit agency required to provide access by elevators despite other "special efforts" to provide transportation for handicapped at the "altered" Columbia Avenue station of the Philadelphia subway); Rhode Island Handicapped Action Comm. v. Rhode Island Pub. Transit Auth., 718 F.2d 490, 497–98 (1st Cir.1983) (state or federal administrators, rather than judges, "are charged with devising the nuts and bolts of transportation programs for the handicapped"). A recent article has described these policy conflicts. Weber, "The Disabled: The 'Last Minority' Fights For Its Rights," Business Week, June 6, 1988, at 140.

The plaintiffs point out that the class of the mobility-impaired encompasses a vastly greater population than the wheelchair-mobile. Many potential passengers for whom an elevator would be an important aid suffer from such disabilities as emphysema. Transportation for the handicapped is an enormously complex issue, involving existing accommodations made by and with the State of New Jersey and other bodies related to funding through the Urban Mass Transportation Assistance Act, 49 U.S.C. §§ 1600 to 1621, as well as general State undertakings to provide such transportation through the New Jersey transit system. Hence, the debate about the wisdom of a policy geared exclusively to the wheelchair-mobile may not resolve the general question of providing better access for the

mobility-impaired. Fundamental policy questions of this nature, subject to accommodation with federal law, are best resolved by the compact states. Obviously, each state would be free to refuse to participate further if its policy goals were not met by the bi-state agency.

This State lacks the sovereign authority to direct the DRPA to cede jurisdiction to New Jersey. Just as "[a] State cannot be its own ultimate judge in a controversy with a sister State," *West Virginia ex rel. Dyer v. Sims,* 341 *U.S.* 22, 28, 71 *S.Ct.* 557, 560, 95 *L.Ed.* 713, 722 (1951), so too a single state cannot dictate the policy of a bi-state agency. We hold that the State of New Jersey cannot exercise unilateral jurisdiction over the DRPA; to the extent that the judgment of the trial court involves a mandatory injunction to compel the DRPA to comply with the directives of the Department of Community Affairs, that judgment must be vacated.

We vacate the judgment and remand the case to the trial court for further proceedings. In view of our conclusion that the DRPA, by virtue of its agreement with Camden, consented to the jurisdiction of the appropriate New Jersey governmental agency for approval of the construction plans, *supra* at 403, the trial court shall receive evidence concerning the DRPA's contention that the installation of the elevator would unduly disrupt or interfere with its rail operations. Unless the DRPA can sustain its burden of proving such disruption or interference, the trial court shall be authorized to enter judgment requiring the Agency to comply with the directives of the Department of Community Affairs. In the alternative, the trial court may consider whether there is complementary legislation in New Jersey and Pennsylvania that would make equivalent the DRPA's obligation in each state to provide barrier-free access to handicapped persons.

CLIFFORD, J., dissenting.

The Court correctly decides that the trial court erred in holding that the Delaware River Port Authority (DRPA) could

be subjected to the unilateral application of New Jersey's statutes and regulations, but goes on to conclude that the °DRPA has given its implied consent to the construction of the elevator. *Ante* at 403, 404. I dissent.

For openers, it should be noted that this theory of implied consent has not been raised or argued by any of the parties at any level of the proceedings. To the extent that its genesis may be made out, it must be uncovered in a statement by the Appellate Division to the effect that the DRPA is "not exempt" from the pertinent New Jersey law "by virtue of the contractual arrangements and property conveyances" between the parties. See *ante* at 391. Assuming that the quoted passage means what the majority says it means, the question of implied consent is one that the parties have not addressed in any fashion. Given the opportunity to do so, they doubtless could present a number of legal and factual arguments in support of their respective positions. But by virtue of its conclusion today, the majority effectively has precluded the parties from ever raising *any* arguments in respect of this novel theory of law.

It is worth noting as well that this matter comes to us on appeal from cross-motions for summary judgment. Sparse as it is—and lacking for obvious reasons any conclusion by a factfinder that the DRPA gave its implied consent—the record belies any notion that such consent may have been given. Negotiations concerning the construction and operation of the Transportation Center began sometime before 1983. The record is replete with the DRPA's express refusal, from that time forward, to allow installation of the elevator, a fact that the majority concedes. *Ante* at 403. The first set of plans— with provisions for staircases and an escalator, but none for an elevator—was submitted to the Department of Community Affairs (DCA) for approval in May 1983. During continuing negotiations with the City and DCA over the next two years

and throughout the pendency of this lawsuit, the DRPA has repeatedly refused to budge from its position that it could not be required to allow the installation of the elevator.

Despite this clear and uncontroverted record, the Court nevertheless determines that the DRPA gave its implied consent to the installation of the elevator. That conclusion springs from a perception that the DRPA "had to understand" that construction of the Center would be subject to state and local construction requirements. *Ante* at 404. But as the record makes plain, DRPA's "understanding" was, in fact, at odds with that suggested by the majority. In a certification submitted to the trial court on a post-judgment application, DRPA's project representative for the construction of the Center indicated that the initial plans and specifications had no provision for an elevator because "other provisions were in effect at that time to transport the handicapped * * *. With this action DRPA was of the opinion that all regulations regarding the transportation of the handicapped had been met." Moreover, when DCA initially pointed out that installation of the elevator was required under the New Jersey Uniform Construction Code, the DRPA responded that its status as a bi-state agency exempted it from the unilateral application of the Code's provisions. How, then, can one possibly conclude that the DRPA "had to understand" that state and local regulations would mandate installation of the elevator?

Further, the Court "note[s], without resolving its meaning," *ante* at 404, a provision of the Agreement that expressly anticipates changes in the construction plans, but only with the added proviso that any such changes "shall require the prior written approval of the CEO of the DRPA." *Ante* at 403– 404. From this, the majority infers that "consent to some changes was implicit in the understanding of the parties * * *." *Ante* at 404. The difficulty in resolving the meaning of the quoted provision escapes me. My guess would be that it means

exactly what it says: any changes in the construction plans, *e.g.*, provision for an elevator, "shall require the prior written approval of the CEO of the DRPA." Absent that approval— and there is none in this case—the DRPA cannot be deemed to have consented to any change in the construction plans.

To a great extent the lengthy and comprehensive Redevelopment and Reconstruction Agreement, entered into by the DRPA and Camden in June 1984, anticipates the problem that confronts us here today. In recognition of the fact that Camden would have to obtain "necessary permits" for the construction of the Transportation Center, the Agreement also provides that if Camden is delayed in obtaining any such permits, the DRPA's only obligation shall be to "consult" with the City in respect of such delay. The DRPA and the City specifically agreed that the DRPA "shall have no obligation to take any action to facilitate the issuance of such permit(s)." In other words, the DRPA is under no contractual obligation to allow installation of the elevator, even if that is what is required to obtain the necessary permits to construct and operate the Transportation Center.

In light of the DRPA's continuous *express* refusal to comply with New Jersey law and to allow installation of the elevator, how could the majority possibly determine that the DRPA had given its *implicit* consent to the installation? Or, perhaps even more troublesome, how could this Court suggest as a matter of law that an implied consent could somehow override an unyielding express refusal to consent? *Cf., e.g., Moser v. Milner Hotels, Inc.,* 6 *N.J.* 278, 280 (1951) (noting the " 'well settled rule that an express contract precludes an implied one. An implied contract cannot exist when there is an existing express contract about the identical subject. The parties are bound by their agreement, and there is no ground for implying a promise.' " (quoting *Voorhees v. Ex'rs of Woodhull,* 33 *N.J.L.* 494, 496 (E. & A.1869)); *Walter v. Introcaso,* 135 *N.J.L.* 461, 463 (E.

& A.1947) ("No grant of an easement can arise by implication where there is an express contract relating to the matter.").

One additional note. The construction of the Transportation Center has been financed in large part by a United States Urban Mass Transit Association grant. As a matter of federal law, then, must Camden provide access for handicapped from the main level of the Center to the PATCO train platform? See, *e.g.*, 49 *U.S.C.*App. § 1612(a) (declaring it to be a national policy that the elderly and the handicapped "have the same right as other persons to utilize mass transportation services [,] * * * and that all Federal programs offering assistance in the field of mass transportation * * * should contain provisions implementing this policy."); 29 *U.S.C.* § 794 ("No otherwise qualified handicapped individual * * * shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance"); *Alexander v. Choate*, 469 *U.S.* 287, 301, 105 *S.Ct.* 712, 720, 83 *L.Ed.*2d 661, 672 (1985) (recognizing that in order to assure the handicapped "meaningful access" to benefits provided by a grantee of federal funds, "reasonable accommodations in the grantee's program or benefit may have to be made."). The DRPA's status as a bi-state agency is irrelevant to the question of whether *Camden* has complied with federal law in its construction of the Center. I recognize that the question of the ramifications of federal financing has not been raised, and I do not pretend to know the answer; but the issue is one that the parties and the trial court may wish to explore on remand.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and O'HERN—6.

*Opposed*—Justice CLIFFORD—1.