241 N.J. Super. 422 (1989)
575 A.2d 70
GAUNTT CONSTRUCTION COMPANY/LOTT ELECTRIC COMPANY, A JOINT VENTURE, THE LOTT GROUP, INC., PLAINTIFF,
v.
THE DELAWARE RIVER AND BAY AUTHORITY, AND JOHN LEWIS, DEFENDANTS.
Superior Court of New Jersey, Law Division, Burlington County.
May 3, 1989.
*423 I. Michael Heine for plaintiff.
David G. Parker (Parker, McCay & Criscuolo, P.A., attorney) and Walter L. Pepperman, II [admitted pro hac vice; Morris, Nichols, Arsht & Tunnell, attorney] for defendants.
HAINES, A.J.S.C.
This is a conflict of laws case to which usual conflict of laws rules do not apply. It involves a bi-state compact approved by the Legislatures of New Jersey and Delaware and the United States Congress. The compact created the Delaware River and Bay Authority, an agency of both states subject to the laws of *424 both states. What law applies when the laws of the two states are at odds?
The Lott Group, Inc. ("Lott") and The Delaware River and Bay Authority ("DRBA") are parties to a written contract for construction work on the Delaware Memorial Bridge and its facilities. Disputes have arisen concerning the performance of the contract work. Section 1.5.1 of the contract provides:
The Director shall act as referee in all questions arising under the terms of the Contract between the parties hereto, and the decision of the Director shall be final and binding. On all questions concerning the interpretation of Plans and Specifications, the acceptability, quality and quantity of materials or machinery furnished and work performed, the classification of material, the execution of the work and the determination of payment due or to become due, the decision of the Director shall be final and binding.
The parties, in accordance with this provision, agreed to appear before the Director for a hearing to be held on January 25, 1988. However, on January 21, 1988, Lott instituted this action, advising the DRBA, through counsel, that it would not appear at the hearing. The Director nevertheless proceeded. He filed a written decision, dated January 26, 1988 in which he noted the non-appearance of Lott, accepted the claims of the DRBA and found that the net amount due Lott was $175,463.16, an amount which Lott considers to be substantially inadequate.
The DRBA thereafter moved to dismiss this action on the ground that the Director's determination deprived this court of jurisdiction. The motion to dismiss was denied in part because the contract clause permitting the resolution of disputes by one party to the contract, the DRBA Director, was unenforceable under New Jersey law. This court also analyzed the Delaware law and concluded that the enforceability of the clause had not been addressed conclusively by any Delaware court.
On June 2, 1988 the DRBA also filed suit in Delaware to enforce the Director's determination. The prosecution of that suit was enjoined. In doing so the usual rule was applied: when suits are pending in two jurisdictions, the court first acquiring jurisdiction has precedence, although particular circumstances *425 not present here, may dictate otherwise. Yancoskie v. Delaware River Port Authority, 78 N.J. 321, 324, 395 A.2d 192 (1978).
A DRBA motion to reconsider the dismissal motion was denied. However, the restraint against prosecution of the Delaware suit was relaxed to the extent necessary to permit the DRBA to obtain a ruling as to the validity of the dispute resolution clause. The hoped-for result of the relaxation was a decision by the Delaware court concluding that the clause was unenforceable, thus bringing the laws of both states into agreement. This result was not obtained. The Delaware court refused to decide the issue but, in doing so, opined that the clause was enforceable in its State.
This court, having retained jurisdiction and continued its restraint against further proceedings in the State of Delaware, now decides that (1) New Jersey law applies, making the proceedings before the DRBA Director and his conclusions a nullity, and (2) this action shall continue for the purpose of adjudicating the breach of contract claims and all other issues involved in these proceedings.

A. The "Arbitration" Proceedings Before the DRBA Director.

Lott, in verifying its New Jersey complaint, as required by R. 4:5-1, stated that the controversy was not "the subject of any other action pending in any court or of a pending arbitration proceeding" and that "no other action or arbitration proceeding was contemplated". The complaint and its verification failed to disclose the existence of the clearly "contemplated" proceedings before the DRBA Director.
The Comment to R. 4:5-1 in Pressler, Rules Governing the Courts of the State of New Jersey, states:
The intent of this rule is to provide notice to all parties in each action that there are other actions pending involving the same controversy. As a result of such notice, all parties can move to intervene in other pending actions, to consolidate *426 other pending actions, or to take whatever other steps may be appropriate to protect their respective interests.
The DRBA claims that Lott, by failing to disclose the proceedings before the Director, violated the Rule, as indeed it did.
The correct practice required Lott to provide more than its bland certification. It should have disclosed the facts concerning the Director's hearing. While non-disclosure did not frustrate the purpose of the Rule since Lott and the DRBA were aware of the anticipated hearing, it denied information to this court which was entitled to complete candor. The absence of candor is at least a violation of the spirit of R.P.C. 3.3 which requires "Candor Toward the Tribunal". The incident must be reported to the Office of Attorney Ethics. However, the violation of R. 4:5-1 requires no other action. Opposing counsel made the court aware of the arbitration proceedings immediately after this suit was filed and their existence played no significant role in the decisions reached here. R. 4:5-1 does not provide sanctions. A dismissal of these proceedings, for example, would be an unacceptable penalty.

B. The Delaware-New Jersey Compact.

The Delaware-New Jersey Compact may be found in N.J.S.A. 32:11E-1 et seq., Del. Code Ann. tit. 17, Secs. 1701, 1721 and Pub.L. 87-678, 76 Stat. 560 (U.S. Congress, Sept. 20, 1962). The Compact provides, insofar as its provisions are relevant here, as follows (Roman numerals refer to Articles in the Compact):
III. The parties pledge "faithful co-operation in the effectuation of this Compact".
IV. The authority "shall constitute an agency of government of the state of Delaware and the State of New Jersey", for the purpose, among others, of constructing, maintaining and operating crossings between the states and facilities. Other functions may be performed "as may be hereafter entrusted to the authority by concurrent legislation expressly in implementation hereof".
VI. The authority's commissioners constitute a board which may take effective action only if at least three commissioners from each state vote in favor of the action, which vote is subject to cancellation by the Governor of the respective state.

*427 VII. This Article provides general powers including the power to adopt by-laws, rules and regulations. It provides, however, that "no by-law, or rule, regulation or order shall take effect until it has been filed with the Secretary of State of each state or in such other manner in each state was may be provided by the law thereof." This Article further provides: "In the establishment of rules, regulations and orders respecting the use of any crossing, transportation or terminal facility owned or operated by the authority, including approach roads, it shall consult with appropriate officials of both states in order to insure, as far as possible, uniformity of such rules, regulations and orders with the law of both states." (Emphasis supplied)
The authority is authorized "to enter into contracts and agreements ... with any individual firm or corporation, deemed necessary or advisable for the exercise of its purposes and powers".
Finally, the article permits the authority to "exercise all other powers not inconsistent with the constitutions of the 2 states or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes or to the exercise of any of the foregoing powers, except the power to levy taxes or assessments, and generally to exercise in connection with its property and affairs, and in connection with property within its control, any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs".
VIII. "... no additional duties or obligations shall be undertaken by the authority under the law of either state or of Congress without authorization by the law of both states".
XIV. Each state consents to the use and occupancy by the authority of its lands and property.
XV. "Judicial proceedings to review any by-law, rule, regulation, order or other action of the authority or to determine the meaning or effect thereof, may be brought in such court of each state, and pursuant to such law or rules thereof, as a similar proceeding with respect to any agency of such state might be brought."
XXI. "The existing territory or boundary lines of the states or the jurisdiction of the two states established by said boundary lines, shall not be changed hereby."
N.J.S.A. 32:11E-8 provides:
The authority shall, from and after the effective date of this act be the agent of the states of Delaware and New Jersey in connection with the construction, operation, maintenance, improvement and control of said bridge which was constructed pursuant to legislation enacted in said states ... commonly known as "the Delaware Memorial Bridge".
The Federal statute approves the Compact; it contains no provisions otherwise significant to this dispute.

*428 C. The Conflicting Laws Regarding the "Arbitration" Provision.

New Jersey statutes require an arbitrator, such as the DRBA Director, to be impartial. N.J.S.A. 2A:24-8b. Our case law is to the same effect. (For present purposes, I will use the term "arbitrator" as describing the Director's position although that term may not be accurate.)
In Barcon Associates v. Tri-County Asphalt Corp. 86 N.J. 179, 430 A.2d 214 (1981), our Supreme Court considered the propriety of an arbitration award made by three arbitrators after a 2 to 1 vote favoring Barcon. It appeared that the arbitrator selected by Barcon, who was one of the two arbitrators in the majority, had a long business relationship with Barcon. The court stressed the requirement that all arbitrators be neutral. It said:
We emphasize that these standards must govern the conduct of all arbitrators in whose hands the dispute resolution process is entrusted  not only so-called "neutral" arbitrators but party-designated arbitrators as well. [At 188, 430 A.2d 214]
In so stating, the court quoted from Brotherton, Inc. v. Kreielsheimer, 8 N.J. 66, 83 A.2d 707 (1951): "An arbitrator acts in a quasi-judicial capacity and must render a faithful, honest and disinterested opinion upon the testimony submitted to him." [at 70] In addition, it cited American Eagle Fire Ins. Co. v. N.J. Ins. Co. 240 N.Y. 398, 405, 148 N.E. 562, 564 (1925), in which the New York Court of Appeals disapproved of the practice of an arbitrator acting as a champion of his or her nominator, saying: "He should sedulously refrain from any conduct which might justify even the inference that either party is the special recipient of his solicitude or favor." The Barcon Court concluded:
Although arbitration originates in the contract of the parties and is a process which may operate without any court involvement, we reject the notion, repeatedly asserted by the dissent, that the parties' contract should prevail over all other considerations.... Because of the confidentiality in which arbitrators conduct their deliberations, the goal of insuring that they will adhere to high standards will best be attained by requiring them to avoid not only actual partiality but also the appearance of partiality. Commonwealth Coatings, *429 Corp. v. Continental Casualty Co. 393 U.S. 145 [89 S.Ct. 337, 21 L.Ed.2d 301] (1968). [86 N.J. at 189-190, 430 A.2d 214]
The burden of showing impermissible bias on the part of an arbitrator is upon the party making that claim. Barcon, 86 N.J. at 191, 430 A.2d 214. "[E]vident partiality", would be present, "if it were shown that there existed a possible conflict of financial interest on the part of the arbitrator; or the arbitrator prejudged the dispute because of bias or partisanship; or that there was animus on the part of the arbitrator against the other side...." Id. An appearance of partiality, if too gross, is enough to disqualify an arbitrator. Thus, the Barcon court said:
No actual bias or partiality on the part of Arbitrator Spatz has been alleged. Nevertheless, throughout the pendency of the arbitration proceedings, Spatz was engaged in business dealings with and was owed substantial sums by the party which designated him. This relationship creates too great an appearance of partiality to be permitted. An arbitrator cannot, if challenged by the other side, to be allowed to participate in a resolution of a dispute when such a manifest conflict of interest exists. As the trial court concluded,
the line between the acceptable general predisposition of attitude permitted in the case of a party-designated arbitrator and impermissible bias or partisanship (or the appearance thereof) is crossed when the arbitrator is involved in active and significant business dealings with a party during the pendency of the arbitration proceedings. The idea of bias or partisan arbitration is conceptually inadmissible, and the law simply cannot allow any judicially enforceable arbitration proceeding to be anything other than an impartial proceeding which has appropriate appearances of impartiality. [Id. at 191, 430 A.2d 214]
The insistent echo of this theme is heard in Chimes v. Oritani Motor Hotel, Inc. 195 N.J. Super. 435, 480 A.2d 218 (App.Div. 1984), in which the contract between the parties named the plaintiffs' union as the arbitrator of all disputes. The court said:
In the circumstances we conclude that the so-called arbitration provision, giving the Board power to decide disputes between its members and defendant, is contrary to public policy. The relationship between the Board and its members is obviously too close to assure the dispassionate and impartial resolution of disputes between AFM members and non-members. See Barcon Assoc. v. Tri-County Asphalt Corp., 86 N.J. 179, 188 and 191 [430 A.2d 214] (1981), holding that an arbitrator cannot satisfy the "high standards of honesty, fairness and impartiality" required of him if he has a conflict of interest derived from business dealings with a party to the dispute. We note that Barcon cited *430 Graham v. Scissor-Tail, Inc. [28 Cal.3d 807, 623 P.2d. 165, [173, 175], 171 Cal. Rptr. 604, 613, 615 (1981)] with approval for the proposition that "`complete contractual autonomy in the choice of an arbitrator' must give way to `the common law requirement of fair procedure.'" Id. [86 N.J.] at 189 [430 A.2d 214]. [195 N.J. Super. at 443, 480 A.2d 218]
In the present case the relationship between the Director and the DRBA, as in Chimes, "is obviously too close to assure the dispassionate and impartial resolution of disputes" between the DRBA and its contractors. Furthermore, the Director is the only arbitrator. In Barcon the arbitrator who was disqualified for bias was one of three. Thus, Barcon applies even more forcibly here than it did there.
The DRBA argues that Lott waived any objection to having the Director as arbitrator when, without objection, it executed the contract containing the arbitration clause obviously knowing of the Director's position and intent. The argument overlooks several aspects of the transaction. This is a contract of adhesion; its oppressive arbitration clause will not be enforced by our courts as a matter of public policy. Chimes, 195 N.J. Super. at 441-442, 480 A.2d 218. The contract, which was the product of public bidding, was prepared by and submitted to bids by the Authority. Its arbitration clause, according to the DRBA brief, has been inserted in hundreds of DRBA contracts as a matter of standard practice. The clause is totally lacking in procedural safeguards; it provides the Director with unbridled decision making power. As a practical matter, Lott had no real opportunity to object to the Director as arbitrator when it signed the contract.
A contract of adhesion is described in Vasquez v. Glassboro Service Ass'n., 83 N.J. 86, 415 A.2d 1156 (1980), as follows:
A contract where one party, as here, must accept or reject the contract does not result from the consent of that party. It is a contract of adhesion:
There being no private consent to support a contract of adhesion, its legitimacy rests entirely on its compliance with standards in the public interest. The individual who is subject to the obligations imposed by a standard form thus gains the assurance that the rules to which he is subject have received his consent either directly or through their conforming to higher public laws and standards made and enforced by the public institutions that legitimately *431 govern him. Slawson, Standard Form Contracts and Democratic Control of Lawmaking Power, 84 Harv.L.Rev. 529, 566 (1971) [At 104, 415 A.2d 1156]
Lott's contract meets this definition.
It is not true that Lott failed to object to the Director as arbitrator before any arbitration took place. This suit is premised upon the theory that the arbitration clause is unenforceable. It was instituted before the so-called arbitration hearing took place. The suit is the objection.
Lott can show no actual bias on the part of the Director because it did not participate in the hearing that took place after this suit was filed. It might find bias in the fact that the Director undertook the hearing in disregard of the suit and reached a conclusion which favored the Authority. However, that is not necessary. The Director's appearance of partiality was enough, without any hearing evidence, to make his role unacceptable as a matter of law. Like the tainted arbitrator in Barcon, he was engaged in business dealings with the DRBA before and after the contract was executed. During that time, presumably, he was paid money (his salary) by the DRBA and was reviewing Lott's work on behalf of the DRBA. He was the significant executive officer of the DRBA. His appearance of bias under these circumstances is enough to disqualify him as an arbitrator, certainly enough when an objection is raised before the arbitration begins. The Barcon view of the Director as arbitrator is summed up in the following comment:
If the dissent's views were the law, each party could designate its own president as its chosen arbitrator. But not even the parties in this case would suggest that such was their intent. After all, neither nominated one of its own officers or employees. Perhaps they recognized, unlike our dissenting brethren, that arbitration should be conducted by arbitrators, not by the parties themselves or their legal advocates. [86 N.J. at 199, 430 A.2d 214]
The contract in Chimes was like the contract here. The union as arbitrator for its contracting member was in a position no different than the Director as arbitrator for his employer. In Chimes, the Appellate Division, while not discussing waiver, refused to enforce the arbitration-clause notwithstanding the lack of an objection when the contract was executed.
*432 Apparently, the Delaware law is contrary to New Jersey's Vice Chancellor Hartnett considered the question in response to the permitted application by the DRBA and said:
Apparently Delaware law is contrary to Judge Haines' view of the law of New Jersey with regard to the validity of section 1.5.1. Delaware's courts have long implicitly, if not explicitly, upheld the validity of clauses similar to it. See Ruckman & Hansen, Inc. v. Delaware River & Bay Authority, Del.Supr., 244 A.2d 277 (1968); Wilson Contracting Co. v. State, Del.Supr., 224 A.2d 396 (1966); Kuhn Construction Company v. State, Del.Supr., 248 A.2d 612 (1968). The Delaware Supreme Court has stated that there is nothing inherently wrong legally with a provision naming a referee to resolve disputes between parties, even though the referee be a person employed by one of them. Wilson Contracting Co., supra, 224 A.2d at 398. While the Wilson Court did not address the issue in detail, a Delaware trial court, if it had the issue properly before it, would undoubtedly be bound by that opinion and would find that the provisions of Section 1.5.1 are not illegal. See also United States v. Moorman, 338 U.S. 457 [70 S.Ct. 288, 94 L.Ed. 256] (1950).
The opinion has not been published and, notwithstanding the quoted language, the Vice Chancellor refused to decide the question because (1) "there is a substantial question whether section 1.5.1 is a written agreement to submit the controversy between the parties to arbitration as is required by 10 Del.C. Sec. 5701. cf. Joseph F. Trionfo & Sons v. Ernest D. LaRosa, 38 Md. App. 598, 381 A.2d 727 (Md. Ct. Sp. App. 1978)"; and (2) "... in the interests of judicial comity and efficiency, I decline to rule on any motion duplicating issues already ruled upon by Judge Haines." Trionfo & Sons certainly raises the question of whether the Director, in the present case, was acting as an arbitrator. However, the clause considered here is different and more exacting than the one addressed in Trionfo & Sons. Were I pressed to decide the question, I would conclude under Delaware law, that the Director was an arbitrator. Nevertheless, the Vice Chancellor's reservation makes the issue debatable. New Jersey law, as discussed below, raises similar questions. Furthermore, DRBA disputes may not be arbitrable. Article XV of the compact authorizes "[j]udicial proceedings to review any ... action of the authority." It is silent as to arbitration.
*433 My earlier reading of the Delaware cases cited by Vice Chancellor Hartnett led to my conclusion that they address the instant issue only through dicta and that, consequently, Delaware law has not been established. Vice Chancellor Hartnett's opinion, though also dicta, invites the respect to which Delaware's Court of Chancery is due. I therefore conclude, for present purposes, that the Delaware law on the contract issue is contrary to that of New Jersey, thus raising the question of what law applies.

D. The DRBA Premises.

The claim of the DRBA that Delaware law controls the arbitration clause rests upon three questionable premises, namely, that (1) the Director was an arbitrator; (2) arbitration is permitted by the compact; and (3) traditional conflict of laws rules apply because the jurisdictions of two states are involved.
Vice Chancellor Hartnett points out that "there is a substantial question whether Section 1.5.1 is a written agreement to submit the controversy between the parties to arbitration as is required by 10 Del.C. Section 5701." Barcon defines arbitration as "a substitution, by consent of the parties, of another tribunal for the tribunal provided by the ordinary processes of law, and its object is the final disposition in a speedy, inexpensive, expeditious and perhaps less formal manner, of the controversial differences between the parties", citing Eastern Engineering Co. v. City of Ocean City, 11 N.J. Misc. 508, 510-11, 167 A. 522 (N.J.Sup. 1933) quoted in Carpenter v. Bloomer, 54 N.J. Super. 157, 162, 148 A.2d 497 (App.Div. 1959). [86 N.J. at 187, 430 A.2d 214] Here, obviously, nothing resembling a substitute "tribunal" was provided by the contract. It was a bare-bones document simply authorizing the resolution of disputes by the DRBA Director.
The Delaware-New Jersey compact authorizes "[j]udicial proceedings". Its failure to mention alternatives makes it very doubtful that arbitration is a permissible one, particularly *434 when, as here, the Director is given no indication of the law to be applied to disputes.
The present litigation does not present the usual conflict of laws problem. A typical case raising the question of which state law to apply involves an analysis of contacts with one state or the other and a consideration of state policies. State Farm Mutual Automobile Insurance Co. v. Simmons, et al., 84 N.J. 28, 417 A.2d 488 (1980). The DRBA, applying the usual rule, argues that the contract "was prepared, bid and executed in Delaware, the location of its subject matter was in Delaware and it was performed in Delaware." This "contact" argument, however, is not available when dealing with the DRBA, a bi-state agency acting pursuant to compacts adopted by both states and the United States Congress. Every contract with the DRBA is a contract "prepared, bid and executed" in New Jersey as well as Delaware; the "subject matter" of the contract was located in New Jersey as well as Delaware and was "performed" in New Jersey as well as Delaware. The compact, which preserves the jurisdiction and boundary lines of the two states, does not require a different conclusion. The Delaware Court of Chancery, considering the DRBA compact in Delaware River and Bay Authority v. Carello, 43 Del. Ch. 213, 222 A.2d 794 (Del. Ch. 1966), agreed saying:
By entering into a compact, such as the one here in issue, a state surrenders pro tanto a portion of its own sovereignty. [222 A.2d At 797]
The significant language of the compact is that which provides that the authority "shall constitute an agency of government of the state of Delaware and the state of New Jersey" [article IV] and is an "agent of the states of Delaware and New Jersey" [N.J.S.A. 32:11E-8] and may not undertake "additional duties or obligations ... without authorization by the law of both states." (Emphasis supplied) Article XV provides concurrent judicial authority to both states for the review of any "action of the authority or to determine the meaning or effect thereof...."
*435 It therefore appears that the premises upon which the DRBA rests its Delaware law claim are not reliable. The contract doubtfully provided for arbitration; the same is true of the compact; the contract does not identify the law to be applied and the conflict of laws rules for which the DRBA contends are not available.

E. The Law to be Applied.

Traditional conflict of laws doctrine is not available in the case of DRBA transactions. The laws of both states apply. What is to be done when they are in conflict?
Alaska Packers Association v. Industrial Accident Commission of California, 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044 (1935), points the way to a solution. In that case, a California workers compensation statute was held to apply to a non-resident alien employee. The employee had been hired in California to work in Alaska and had been injured in Alaska. He was to be paid in California on his return. The California law was applied despite its conflict with the law of Alaska. In resolving the conflict problem, the court said:
In the case of statutes, the extra-state effect of which Congress has not prescribed, where the policy of one state statute comes into conflict with that of another, the necessity of some accommodation of the conflicting interests of the two states is still more apparent. A rigid and literal enforcement of the full faith and credit clause, without regard to the statute of the forum, would lead to the absurd result that, wherever the conflict arises, the statute of each state must be enforced in the courts of the other, but cannot be in its own. Unless by force of that clause a greater effect is thus to be given to a state statute abroad than the clause permits it to have at home, it is unavoidable that this Court determine for itself the extent to which the statute of one state may qualify or deny rights asserted under the statute of another. See Olmsted v. Olmsted, 216 U.S. 386, 30 S.Ct. 292, 54 L.Ed. 530, 25 L.R.A. (N.S.)1292(1910); Aetna Life Insurance Co. v. Dunken, supra, page 393 of 266 U.S. [389], 45 S.Ct. 129 [69 L.Ed. 342 (1924)].
The necessity is not any the less whether the statute and policy of the forum is set up as a defense to a suit brought under the foreign statute or the foreign statute is set up as a defense to a suit or proceedings under the local statute. In either case, the conflict is the same. In each, rights claimed under one statute prevail only by denying effect to the other. In both the conflict is to be resolved, not by giving automatic effect to the full faith and credit clause, *436 compelling the courts of each state to subordinate its own statutes to those of the other, but by appraising the governmental issues of each jurisdiction, and turning the scale of decision according to their weight.
The enactment of the present statute of California was within state power and infringes no constitutional provision. Prima facie every state is entitled to enforce in its own courts its own statutes, lawfully enacted. One who challenges that right, because of the force given to a conflicting statute of another state by the full faith and credit clause, assumes the burden of showing upon some rational basis, that of the conflicting interests involved those of the foreign state are superior to those of the forum. It follows that not every statute of another state will override a conflicting statute of the forum by virtue of the full faith and credit clause; that the statute of a state may sometimes override the conflicting statute of another, both at home and abroad; and, again, that the two conflicting statutes may each prevail over the other at home, although given no extraterritorial effect in the state of the other.
....
... [I]n the present case, only if it appears that, in the conflict of interests which have found expression in the conflicting statutes, the interest of Alaska is superior to that of California, is there rational basis for denying to the courts of California the right to apply the laws of their own state. [At 547-549, 55 S.Ct. at 523-525]
The United States Supreme Court concluded as follows:
The interest of Alaska is not shown to be superior to that of California. No persuasive reason is shown for denying to California the right to enforce its own laws in its own courts, and in the circumstances the full faith and credit clause does not require that the statutes of Alaska be given that effect. [At 550, 55 S.Ct. at 525]
Alaska Packers Association was cited in Teamsters Local No. 676 v. Port Authority Transit Corp., 108 N.J. Super. 502, 261 A.2d 713 (Ch.Div. 1970), in which the court, dealing with conflicting labor laws in New Jersey and Pennsylvania as they affected a bi-state agency, decided that the New Jersey law applied.
In accordance with Alaska Packers Association and Teamsters Local No. 676, the burden is on the DRBA to show that the Delaware law upon which it relies is superior to New Jersey law. This burden has not been carried. New Jersey law requires the DRBA to submit the present dispute to a court of law, or to some other agreed upon neutral decision maker; it prohibits the use of the Director as the decision maker. That *437 rule is particularly compelling when applied to a contract which, as here, provides no procedural safeguards of any kind. No reason appears which makes the New Jersey requirement unacceptable or unduly burdensome. Every traditional concept of dispute resolution expects decisions to be made with impartial independent procedural and substantive fairness. The only alternative argument, inferentially at least, is an unacceptable one  that using the Director is advantageous to the DRBA.
The DRBA, as a bi-state agency bound by the terms of its bi-state compact, was obliged to act pursuant to, and only pursuant to, the laws of both states. No law has been adopted by both states providing a solution to a conflict of laws problem although Article VIII of the compact urges consultation "with appropriate officials of both states in order to insure, as far as possible, uniformity of such rules, regulations and orders with the laws of both states." (One technique for resolving such disputes of law through legislation may be found in N.J.S.A. 32:1-35.63.) Thus, it is the DRBA which had the burden of resolving conflict of laws problems, and the DRBA which has failed to do so. Its own forms of contract are silent on the subject. It is fair that the DRBA suffer the consequences. Notwithstanding these circumstances, the DRBA now argues that the law of one state, that of Delaware, should apply. Acceptance of that argument would be an acceptance of the inequitable. This court's obligation runs in the other direction. New Jersey's law promotes fairness. The DRBA contract clause does not. It is entirely clear that New Jersey law must be applied.
The solution reached here  requiring the DRBA to abide by New Jersey law, is the same solution reached by the Delaware Court of Chancery in Delaware River & Bay Authority v. Carello, a case involving a labor dispute controlled by the conflicting laws of Delaware and New Jersey. Since both states had failed to adopt enabling laws, the court held that the Delaware law, which a union sought to enforce, could not be *438 applied. In the absence of compatible legislation, it enjoined further action on the part of the union, thus denying relief. Here, the refusal to enforce the arbitration clause represents a parallel conclusion.
One aspect of the traditional conflict of laws approach does remain. It parallels the rule of Alaska Packers Association. In State Farm Mutual Automobile Ins. Co., our Supreme Court said:
At the same time, this choice of law rule [making the place of the contract the significant factor] should not be given controlling or dispositive effect. It should not be applied without a full comparison of the significant relationship of each state with the parties and the transaction. That assessment should encompass any valuation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy. [84 N.J. at 37, 417 A.2d 488]
"State policies" and "governmental interests" play a significant role in traditional conflict of laws cases and should continue to be a significant consideration in cases dealing with a bi-state agency. DRBA argues that public policy is to be found only in legislation and that none exists in the present setting. If so, no helpful legislation exists in either state in the present case; but the argument ignores the arbitration statutes of both states which require neutral arbitrators. 10 Del. Code Ann. tit. 10, Sec. 5714; N.J.S.A. 2A:24-8b. Thus public policy, legislatively declared by both states, supports New Jersey arbitration case law. Furthermore, New Jersey, while agreeing that public policy may be reflected in legislative enactments, finds that policy in judicial decisions as well. In State Farm, the court said: "[d]ecisional law interpreting legislation constitutes another reflection of state policy." [At 40, 417 A.2d 488] In Vasquez v. Glassboro Service Ass'n., Inc. 83 N.J. 86, 415 A.2d 1156 (1980), the court said: "[t]he sources of public policy include Federal and state legislation and judicial decisions." [at 98, 415 A.2d 1156; emphasis supplied] Public policy can be an overriding consideration in a conflict situation. In State Farm our Supreme Court said that if the legislature had chosen "to apply its standards as to scope of coverage for insurance *439 policies to out-of-state insurance companies which insure out-of-state motorists, New Jersey courts would follow that directive even when the law of other jurisdictions dictated a contrary result." [At 84 N.J. 39, 417 A.2d 488] It therefore appears that New Jersey public policy should be applied by a New Jersey court having concurrent jurisdiction when a conflict of laws issue involving a bi-state agency is presented to it.
All of these reasons support the application of New Jersey policy as well as New Jersey law and require a refusal to permit the use of the Director as a dispute resolver. There is no showing by the DRBA that the Delaware rule, on balance, outweighs the New Jersey rule, and it appears from the Carello case that Delaware would reach the same conclusion, namely, that the provision is not enforceable because no conflict of laws rule covering the DRBA has been enacted.

CONCLUSION
This court will try this case to a conclusion. New Jersey law applies. The "arbitration" findings are a nullity because the Director was not qualified to conduct the proceedings.