575 A.2d 13

GAUNTT CONSTRUCTION COMPANY/LOTT ELECTRIC COMPA-
NY, A JOINT VENTURE, THE LOTT GROUP, INC., PLAIN-
TIFF–RESPONDENT, v. THE DELAWARE RIVER AND BAY
AUTHORITY AND JOHN LEWIS, DEFENDANTS–APPEL-
LANTS.

Superior Court of New Jersey
Appellate Division

Argued December 12, 1989—Decided March 6, 1990.

Before Judges MICHELS, DEIGHAN and BROCHIN.

*Walter L. Pepperman, II,* of the Delaware Bar, argued the cause for appellants (*Parker, McCay & Criscuolo,* attorneys; *Leone L. Ciporin,* of the Delaware Bar, and *Walter L. Pepperman,* of counsel; *David A. Parker,* on the brief).

*I. Michael Heine* argued the cause for respondent (*Heine Associates,* attorneys; *I. Michael Heine* and *E. Hunter Taylor,* of counsel and on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Pursuant to leave granted by this court, defendants Delaware River & Bay Authority (Authority) and John Lewis, Project Engineer, appeal from an order of the Law Division that declared that the laws of the State of New Jersey applied to the construction contract between plaintiff Gauntt Construction Company/Lott Electric Company, a joint venture, The Lott Group, Inc. (Lott Group) and the Authority, thereby making the proceedings before the Authority director and his conclusions null and void, and ordering the action to continue before the trial court for the purposes of adjudicating the breach of contract claims and all other issues involved in the proceeding.

The facts giving rise to this appeal are essentially uncontroverted. The Authority and the Lott Group[1] entered into a written contractual agreement for modifications and improvements to the maintenance building located at the Delaware Memorial Bridge Complex in New Castle, Delaware. Section 1.5.1 of the contract provides:

> The Director shall act as referee in all questions arising under the terms of the Contract between the parties hereto, and the decision of the Director shall be final and binding. On all questions concerning the interpretation of Plans and Specifications, the acceptability, quality and quantity of materials or machinery furnished and work performed, the classification of material, the execution of the work and the determination of payment due or to become due, the decision of the Director shall be final and binding.

A dispute arose between the parties concerning the performance of the work and the amount due and owing under the contract. Pursuant to section 1.5.1, the parties agreed to appear before the Director for an arbitration hearing to be conducted on January 25, 1988. However, on January 21, 1988, the Lott Group instituted this action in the Superior Court of New Jersey, Law Division, seeking compensatory damages for work performed under the contract. In addition to filing the complaint, the Lott Group's attorney certified to the trial court that "to [his] knowledge the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding" and that "to [his] knowledge, no other action or arbitration procedure is contemplated."[2] Thereafter, the Lott Group, through counsel, notified the Authority of the filing of the lawsuit and advised the Authority that it would not appear at the hearing. The Director nevertheless proceeded, conducting the arbitration hearing as scheduled, and, at the

---

[1]The Lott Group, Inc. is a successor by merger to Gauntt Construction Company/Lott Electric Company.

[2]The trial court stated that this misrepresentation, in violation of *R.* 4:5-1, would be reported to the Office of Attorney Ethics. After review of this matter, the Secretary for the Supreme Court of New Jersey District IV Ethics Committee informed the trial court and counsel that he "determined that the matter should not proceed further to formal proceeding."

conclusion thereof resolved all claims between the parties and awarded the Lott Group $175,463.16. The Lott Group considered this amount to be grossly inadequate.

The Authority raised the arbitration award as an affirmative defense, and moved for a judgment on the pleadings. The trial court denied the Authority's motion to dismiss, stating that "the contract clause permitting the resolution of disputes by one party to the contract, the [Authority] Director, was unenforceable under New Jersey law." The trial court also analyzed Delaware law and concluded that "the enforceability of the clause had not been addressed conclusively by any Delaware court."

On June 2, 1988, the Authority instituted suit in the Delaware Chancery Court, seeking enforcement of the arbitration award. The prosecution of that action was enjoined on the theory that "when suits are pending in two jurisdictions, the court first acquiring jurisdiction has precedence, although particular circumstances not present here, may dictate otherwise." The trial court then lifted the restraint against the prosecution of the Delaware suit "to the extent necessary to permit the [Authority] to obtain a ruling as to the validity of the dispute resolution clause."

On August 29, 1988, the Authority moved for summary judgment in Delaware on the issue of the validity of the arbitration provision. The Delaware court refused to decide the issue of whether the arbitration provision was valid, but opined that such clauses are generally enforceable under Delaware law. Specifically, the Delaware court stated that "a Delaware trial court, if it had the issue properly before it, would undoubtedly be bound by [the Delaware Supreme Court's *Wilson*][3] opinion and would find the provisions of Section 1.5.1 are not illegal." Noting that the courts of Delaware and New Jersey have concurrent jurisdiction over this dispute, the Delaware

[3] *Wilson Contracting Co. v. State,* 224 A.2d 396 (Del.1966).

court denied the Authority's motion for summary judgment because the suit was "first filed in the New Jersey court which has proceeded to consider the entire controversy." In so holding, the Delaware court noted: "Even if, however, the New Jersey court has in fact failed to correctly apply the correct conflict of law principles, as the Authority claims, there is an appropriate remedy in the courts of New Jersey." The Delaware court also stated that the Authority is not entitled to summary judgment because "there is a substantial question whether section 1.5.1 is a written agreement to submit the controversy between the parties to arbitration as is required by 10 *Del.C.* § 5701."

On January 23, 1989, the Lott Group moved to reinstate the restraint against further proceedings in the State of Delaware. The trial court, having retained jurisdiction, indicated that it would reconsider its earlier opinion regarding the choice of law issue. On May 3, 1989, the trial court issued a second opinion, affirming its initial opinion. The trial court held: "1) New Jersey law applies, making the proceedings before the [Authority] Director and his conclusions a nullity, and 2) this action shall continue for the purpose of adjudicating the breach of contract claims and all other issues involved in these proceedings." *Gauntt Constr. Co. v. Delaware River & Bay Auth.*, 241 *N.J.Super.* 422, 575 *A.*2d 70 (Law Div.1989). This appeal followed.

■ This appeal presents the difficult question of whether New Jersey or Delaware law should apply when both states have concurrent jurisdiction. The interstate compact between New Jersey and Delaware is silent on this issue and, thus, does not provide a method of resolving this type of dispute. The compact, in pertinent part, merely states:

Judicial proceedings to review any by-law, rule, regulation, order or other action of the authority or to determine the meaning or effect thereof, may be brought in such court of each State, and pursuant to such law or rules thereof, as a similar proceeding with respect to any agency of such State might be brought.

Each State may provide by law what penalty or penalties shall be imposed for violation of any lawful rule, regulation or order of the authority, and, by law or rule of court, for the manner of enforcing the same. [*N.J.S.A.* 32:11E–1, art. XV].

We begin our analysis with *Alaska Packers Ass'n v. Industrial Accident Comm'n*, 294 *U.S.* 532, 55 *S.Ct.* 518, 79 *L.Ed.* 1044 (1935), where the United States Supreme Court was faced with a decision as to which state's law to apply where the laws of both states were applicable. There, the Supreme Court enunciated a balance of interest test to resolve conflict of law problems. In so doing, the Supreme Court stated:

In the case of statutes, the extra-state effect of which Congress has not prescribed, where the policy of one state statute comes into conflict with that of another, the necessity of some accommodation of the conflicting interests of the two states is still more apparent. A rigid and literal enforcement of the full faith and credit clause, without regard to the statute of the forum, would lead to the absurd result that, wherever the conflict arises, the statute of each state must be enforced in the courts of the other, but cannot be in its own. Unless by force of that clause a greater effect is thus to be given to a state statute abroad than the clause permits it to have at home, it is unavoidable that this Court determine for itself the extent to which the statute of one state may qualify or deny rights asserted under the statute of another. See *Olmsted v. Olmsted*, 216 *U.S.* 386, 30 *S.Ct.* 292, 54 *L.Ed.* 530, 25 L.R.A. (N.S.) 1192 [ (1910) ]; *Aetna L. Ins. Co. v. Dunken, supra* (266 *U.S.* [389] 393, 45 *S.Ct.* 129, 69 *L.Ed.* [342] 346 [ (1924) ] ).

The necessity is not any the less whether the statute and policy of the forum is set up as a defense to a suit brought under the foreign statute or the foreign statute is set up as a defense to a suit or proceedings under the local statute. In either case, the conflict is the same. In each, rights claimed under one statute prevail only by denying effect to the other. In both the conflict is to be resolved, not by giving automatic effect to the full faith and credit clause, compelling the courts of each state to subordinate its own statutes to those of the other, *but by appraising the governmental interests of each jurisdiction, and turning the scale of decision according to their weight.*

The enactment of the present statute of California was within state power and infringes no constitutional provision. Prima facie every state is entitled to enforce in its own courts its own statutes, lawfully enacted. *One who challenges that right, because of the force given to a conflicting statute of another state by the full faith and credit clause, assumes the burden of showing, upon some rational basis, that of the conflicting interests involved those of the foreign state are superior to those of the forum.* [*Id.* at 547–548, 55 *S.Ct.* at 523–524, 79 *L.Ed.* at 1052 (emphasis supplied) ].

In *Alaska Packers Ass'n*, the employment contract in question was entered into in California. The employee, an alien who

resided in Mexico, was hired with 53 others in California. The contract provided for the workers' transportation to Alaska where the work was to be performed. At the conclusion of the seasonal employment, the workers were to be returned to California and paid their full wages. The employee was injured in Alaska. The Supreme Court noted that California had a legitimate public interest in controlling and regulating such employer-employee relationships to prevent injured employees from being remediless and thus becoming public charges of the state. Applying the above-mentioned test, the Supreme Court held that the interest of Alaska was not shown to be superior to that of California, and, therefore, California law applied.

In *State Farm Mutual Auto. Ins. Co. v. Simmons' Estate*, 84 *N.J.* 28, 417 *A.*2d 488 (1980), the New Jersey Supreme Court set forth the traditional conflict-of-law rule applicable in contract cases. There, the Court began its analysis by considering the relevant factors listed in the *Restatement (Second) of Conflict of Laws* (1971):

> The *Restatement* identifies seven general considerations germane to a court's conflict-of-law analysis, *viz.*: (1) the needs of the interstate and international system, (2) the relevant policies of the forum, (3) the relevant policies of other affected states and the relevant interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability, and uniformity of result, and (7) ease in the determination and application of the law to be applied. [*Id.* at 34, 417 *A.*2d 488 (citing *Restatement, supra*, § 6)].

In settling the conflict-of-law issue, the Court weighed the important considerations, stating:

> that the law of the place of the contract ordinarily governs the choice of law because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law. See *Buzzone v. Hartford Accident & Indemnity Co., supra*, 23 *N.J.* [447] at 458 [129 *A.*2d 561 (1957)], *Mayer v. Roche*, 77 *N.J.L.* 681, 683 [75 *A.* 235 (1909)] (E. & A. 1909); *A. Ehrenzweig, A Treatise on the Conflict of Laws* § 174 at 460–461 (1962); *R. Leflar, American Conflicts of Law* § 86 at 173 (3 ed. 1977); *Restatement, supra*, § 193. At the same time, this choice-of-law rule should not be given controlling or dispositive effect. It should not be applied without a full comparison of the significant relationship of each state with the parties and the transaction. That assessment should encompass an

evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy. [*Id.* at 37, 417 *A.*2d 488].

Thus, the Court held that:

in an action involving the interpretation of an automobile liability insurance contract, the law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy. This rule is to be applied unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield. [*Id.*].

The Court then considered the sources of state public policy. Noting the many expressions of state public policy, the Court first looked to state legislation. Next, the Court noted that decisional law interpreting legislation is another source of state policy. *Id.* at 40, 417 *A.*2d 488 (citing *Vasquez v. Glassboro Service Ass'n*, 83 *N.J.* 86, 98, 415 *A.*2d 1156 (1980)). Because the public policy of both states (New Jersey and Alabama) sought to achieve the same fundamental goals and objectives, the court concluded that "[t]he distinctions between these states ... do not in the context of this case demand the full and literal application of the insurance laws of New Jersey to determine the obligations of the parties in order to vindicate the public policy of this State." *Id.*, 84 *N.J.* at 42, 417 *A.*2d 488.

In *Interstate Wrecking Co. v. Palisades Interstate Park Comm'n*, 57 *N.J.* 342, 273 *A.*2d 10 (1971), the Supreme Court resolved a conflict-of-law issue arising from a contract dispute between a private contractor and the Palisades Interstate Park Commission (Commission), created by an interstate compact between New Jersey and New York. The Commission "was established by the compact as the 'joint corporate municipal instrumentality of the States of New Jersey and New York.'" *Id.* at 345, 273 *A.*2d 10. Certain buildings on Iona Island in New York were to be demolished so that the Island could be developed for recreational purposes. The Commission advertised for bids in New York. The contract was executed by the parties in New York. All of the work was performed in New York. The plaintiff was paid from the appropriations made by

the New York legislature. The plaintiff wrecking company—the successful bidder—however, was a New Jersey corporation. The contract specifically provided that "the work would be done in compliance 'with all of the laws of the State of New York' and 'with the lawful directions of the officers, agents or representatives of the State.' " *Id.* at 344, 273 *A.*2d 10. Additionally, "the contract set forth that the Commission was 'acting for and in behalf of the State of New York' and contained additional references to New York but none to New Jersey." *Id.*

Although the Court found that New Jersey had "ample jurisdiction to entertain the plaintiff's action against the Commission and that any ensuing judgment would be entitled to full faith and credit in New York," the Court then decided the question of whether New Jersey's jurisdiction should be withheld under principles of comity or under the doctrine of *forum non conveniens*. *Id.* at 350, 273 *A.*2d 10. In so doing, the Court noted that although the Commission had been

designed in the compact as a "joint corporate municipal instrumentality" its operations have consistently recognized the territorial separations of the respective states; the park is divided into New York and New Jersey sections (*N.J.S.A.* 32:14-5); employees are separated into New York and New Jersey employees with divided benefits (*N.J.S.A.* 32:14-4); separate police and enforcement units are maintained (*N.J.S.A.* 32:14-20-26); and there are separate controls for acquisitions and disbursements.... "To date, by interstate cooperation, litigation emanating from New York has been remitted to the New York Attorney General and, similarly, matters involving the New Jersey section have been serviced by the New Jersey Attorney General," and that since inception, "no attempt has been made to transpose or intertwine the several liabilities of the respective States."

When the Wrecking Company entered into its contract with the Commission it undoubtedly was aware that there were vital administrative separations between New York and New Jersey and that it was dealing entirely with New York. [*Id.* at 351, 273 *A.*2d 10].

The Court held that under the circumstances, it was evident that the plaintiff should have brought its action in New York rather than in New Jersey. Indeed, the Court emphasized that "[a]ll of the pertinent documents were drawn in New York, all of the demolition occurred in New York and all of the significant witnesses would presumably come from New York." *Id.*

at 352, 273 *A*.2d 10. Thus, the Court stated that "[d]ecent regard for the convenience of all those concerned as well as for the vital administrative separations in the Commission's operations would have dictated the choice of New York rather than New Jersey as the appropriate forum." *Id.*

More recently, in *Eastern Paralyzed Veterans Ass'n v. Camden*, 111 *N.J.* 389, 545 *A*.2d 127 (1988), our Supreme Court resolved a conflict-of-law issue arising from a case involving a cooperative undertaking by a bi-state agency and a New Jersey municipal agency to create a downtown mass transportation center in New Jersey. The Association of handicapped persons filed suit to compel the city and the Delaware River Port Authority (DRPA) to install elevators in a mass transit terminal being constructed in New Jersey. The Court noted that:

> The Delaware River Port Authority was created with the approval of Congress by an interstate compact between the State of New Jersey and the Commonwealth of Pennsylvania. *N.J.S.A.* 32:3–2. The primary purpose of the DRPA is the development and maintenance of bridges and port facilities between the two states. In addition, the Authority is authorized to provide a rail transportation service (PATCO service) between the City of Philadelphia and various communities within the port district in New Jersey. *N.J.S.A.* 32:3–2(b). Such an interstate compact is a "law of the Union," *Delaware River Joint Toll Bridge Comm'n v. Colburn*, 310 *U.S.* 419, 427, 60 *S.Ct.* 1039, 1040, 84 *L.Ed.* 1287, 1289 (1940), whose interpretation is a question of federal law. *Cuyler v. Adams*, 449 *U.S.* 433, 438 n. 7, 101 *S.Ct.* 703, 707 n. 7, 66 *L.Ed.*2d 641, 648 n. 7 (1981). [*Id.* at 397, 545 *A*.2d 127].

The Court also stated:

> The DRPA, then, is not the agency of a single state, but rather a public corporate instrumentality of both New Jersey and Pennsylvania. *Yancoskie v. Delaware River Port Auth.*, 155 *N.J.Super.* 1, 4 [382 *A*.2d 77] (1977), *aff'd*, 78 *N.J.* 321 [395 *A*.2d 192] (1978); *see also Yancoskie v. Delaware River Port Auth.*, 478 *Pa.* 396, 387 *A*.2d 41 (Pa.1978) (Pennsylvania's immunity does not extend to this agency). "It follows that neither creator state can unilaterally impose additional duties, powers or responsibilities upon the Authority." *Nardi v. Delaware River Port Auth.*, 88 *Pa.Commw.* 558, 560, 490 *A*.2d 949, 950 (1985) (citing *C.T. Hellmuth & Assocs., Inc. v. Washington Metropolitan Area Transit Auth.*, 414 *F.Supp.* 408 (D.Md.1976), and *Bell v. Bell*, 83 *N.J.* 417 [416 *A*.2d 829] (1980)).
>
> In *Bell, supra*, Justice Sullivan explained that New Jersey could not unilaterally exercise jurisdiction over the DRPA, a bi-state agency, because to do so would violate a compact that made no provision for such jurisdiction. [*Id.* at 398, 545 *A*.2d 127].

Applying that rationale, the Court concluded that "to hold that the DRPA is subject to [New Jersey's statutes] would result in the imposition, unauthorized by the bi-state compact, of substantial duties or responsibilities on that Authority." *Id.* Thus, the Court held that the Department of Community Affairs could not unilaterally impose on the DRPA the obligations set forth in the New Jersey Uniform Construction Code and the New Jersey Law Against Discrimination.

The Court then considered the real policy question as to whether and on what terms the handicapped shall have access to public transportation. "For underlying the dry technicalities of jurisdiction is the more fundamental question of governmental transit policy." *Id.* at 404, 545 *A.*2d 127. After considering state and federal policy, the Court concluded that:

> This State lacks the sovereign authority to direct the DRPA to cede jurisdiction to New Jersey. Just as "[a] State cannot be its own ultimate judge in a controversy with a sister State," *West Virginia ex rel. Dyer v. Sims,* 341 *U.S.* 22, 28, 71 *S.Ct.* 557, 560, 95 *L.Ed.* 713, 722 (1951), so too a single state cannot dictate the policy of a bi-state agency. We hold that the State of New Jersey cannot exercise unilateral jurisdiction over the DRPA. [*Id.* at 407, 545 *A.*2d 127].

Analogously, in *Bell v. Bell,* 83 *N.J.* 417, 416 *A.*2d 829 (1980), the Supreme Court held that the New Jersey Tort Claims Act does not apply to a bi-state agency. There, the plaintiff sustained injuries when she struck an unmarked girder supporting a railroad bridge used and maintained jointly by Conrail and PATCO. The Court stated that "[t]he New Jersey Legislature does not have the power to modify by unilateral action the waiver of sovereign immunity set forth in the bi-state compact; yet that would be the result were the Tort Claims Act held to apply to DRPA." *Id.* at 424, 416 *A.*2d 829.

Similarly, in *Delaware River & Bay Auth. v. New Jersey Pub. Employment Relations Comm'n,* 112 *N.J.Super.* 160, 270 *A.*2d 704 (App.Div.1970), aff'd o.b., 58 *N.J.* 388, 277 *A.*2d 880 (1971), New Jersey enacted its Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 et seq., subsequent to the creation of the plaintiff authority, a bi-state agency of New Jersey and

Delaware. There, we held that New Jersey could not unilaterally vest the Public Employment Relations Commission with jurisdiction over the bi-state agency in violation of the compact which made no provision for such jurisdiction. In so holding, we emphasized that:

> Bi-state agencies exist by virtue of compacts between the states involved, entered into by their respective legislatures with the approval of Congress. When formed, they become a single agency of government of both states. Their primary purpose is to cooperate in advancing the mutual interests of the citizens of both states by joint action to overcome common problems. We fail to see how either state could enact laws involving and regulating the bi-state agency unless both states agree thereto. To sanction such practice would lead to discord and a destruction of the purposes for which such bi-state agencies are formed. [112 *N.J.Super.* at 165–166, 270 *A.*2d 704].

Likewise, in *Delaware River & Bay Auth. v. Carello*, 43 *Del.Ch.* 213, 222 *A.*2d 794 (Del.Ch.1966), the Delaware court held that where an interstate compact exists, one state may not unilaterally legislate so as to place burdens on the compact. The court stated that "[b]y entering into a compact ... a state surrenders pro tanto a portion of its own sovereignty." *Id.*, 222 *A.*2d at 797 (citing *United States v. Bekins*, 304 *U.S.* 27, 58 *S.Ct.* 811, 82 *L.Ed.* 1137 (1938)).

Applying these fundamentally sound principles in this case, it is evident that the trial court's theory of jurisdiction cannot be sustained. Here, the contract in dispute was prepared, bid, accepted and executed in Delaware. Moreover, the subject matter of the contract—the maintenance building—was located in Delaware and the work was performed in Delaware. New Jersey's only connection in this matter concerns the citizenship of the parties. The Lott Group is a New Jersey corporation. The Authority is an agent of New Jersey and Delaware, and, therefore, is subject to the jurisdiction of both states. After carefully considering the circumstances surrounding the contract in question, we find that Delaware has greater contacts. Clearly, the Authority has met its burden of proving that Delaware's interests are superior to those of New Jersey. As

such, the law of Delaware should have been applied to resolve this dispute.

Moreover, we are satisfied that it is not fundamentally unfair to enforce the arbitration provision in this contract if such provision is valid and enforceable under Delaware law. The trial court, on the other hand, after considering New Jersey state policies and governmental interests, concluded that public policy reflected in both states' arbitration statutes and in New Jersey decisional law prevents a biased party from acting as an arbitrator. Thus, the trial court applied New Jersey's public policy to resolve this dispute. In *Eastern Paralyzed Veterans Ass'n v. Camden, supra,* 111 *N.J.* at 407, 545 *A.*2d 127, however, the New Jersey Supreme Court expressly refused to allow a single state to "dictate the policy of a bi-state agency." That case involved an even more compelling policy question concerning handicapped individuals' access to public transportation. There, the Court held that New Jersey lacked the authority to direct the DRPA to cede jurisdiction to New Jersey. Consequently, New Jersey's public policy should not be the basis for the construction of this bi-state agency's contract.

Accordingly, the order under review is reversed and the matter is remanded to the trial court for further proceedings applying Delaware law to resolve the underlying contract dispute between the parties.